No. 44,395

HELEN V. JOHNSTON, Administratrix of the Estate of Harold L. Johnston, Deceased, *Appellee,* v. ELWOOD M. ECORD, *Appellant.*

(412 P. 2d 990)

Opinion filed April 9, 1966.

*Gerald Sawatzky,* of Wichita, argued the cause, and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Donald L. Cordes, Robert L. Howard, Charles J. Woodin, Mikel L. Stout, Ronald K. Badger, Benjamin C. Langel,* and *Phillip S. Frick,* all of Wichita, were with him on the brief for the appellant.

*Gerald L. Michaud,* of Wichita, argued the cause, and *Russell Cranmer, Orval L. Fisher,* and *M. William Syrios,* all of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is a negligence action in two counts brought by an administratrix. The first cause of action is for personal injury to plaintiff's decedent prior to death and for automobile damage, and the second is for wrongful death, both allegedly caused by negligence of defendant in a rear-end auto collision. The jury assessed damages for plaintiff on both causes after a directed verdict on the liability phase of the case and defendant appeals.

Consideration of the liability feature requires a review of the evidence thereon. The decedent and defendant were the drivers of automobiles involved in a collision which occurred on a Saturday afternoon, August 19, 1961, on U. S. highway 54 in Wichita. Decedent died October 7, 1961. There were two witnesses on the issue of liability; an investigating police officer and defendant. West Kellogg avenue is a four lane divided highway with a medial strip of grass twenty-four feet wide between the eastbound and westbound lanes. The minimum speed limit is thirty-five and the maximum fifty miles per hour. Near the 1200 block on the north or westbound lanes on a downhill grade there is an exit for traffic for Seneca street, the exit being west of the crest of an overpass bridge for Seneca street. Further west there is an approach to Kellogg avenue from Seneca street, as reflected in photographs of the scene. Kellogg contains additional lanes for the use of exiting and entering traffic. According to the investigating officer the collision took place in the south or left westbound lane between the Seneca exit and the approach, the point of impact being fifty-four feet east of the east edge of the approach from Seneca street. Defendant's vehicle laid down sixty-one feet of skidmarks prior to impact and another twenty-three feet of skidmarks after impact. The officer testified there were no skidmarks he could relate to decedent's vehicle. He discussed the collision with both drivers, both signed written reports, and the officer further testified:

"Q. Tell the Court and jury what the driver of each vehicle told you.

"A. The driver of the No. 1 vehicle—

"Q. That was who now?

"A. That was the—Mr. Johnston.

"Q. All right.

"A. —stated that he had pulled out and passed a—another vehicle on the east side of the overpass and remained in this lane. As he was coming down the west slope, he saw a dog coming across from the south and applied his brakes, slowing up, when he was struck in the rear. The driver of the No. 2 vehicle, Mr. Ecord, stated that he was following another vehicle west. Both of them were in the right-hand lane. He stated the other vehicle suddenly applied her brakes and slowed sharply. He was—unknown reason that she slowed up. He stated that at the point almost past the exit road, the No. 2 driver or Mr. Ecord, glanced back, saw that there was no one in his immediate rear or that he could see no one behind him, pulled over into the left lane and, as he did, he saw the No. 1 vehicle had applied his brakes, and he also attempted to stop, was unable to stop before the impact.

. . . . . . . . . . . .

"Q. All right, sir. Now, if I understand it correctly, Mr. Johnston told you that he passed this other car when he was east of the overpass?

"A. Yes, sir.

"Q. And did you ask him or did he say why he still remained in the inside lane of traffic?

"A. I don't recall what the conversation was in regard to why he stayed over there.

"Q. Now, sir, did you ask Mr. Johnston where this dog was when he started slowing his vehicle?

"A. I—I really can't recall that I asked him that particular question. However, somewhere in the conversation he said it was running from the south.

"Q. It hadn't yet got out on the road, had it?

"A. That I couldn't say."

Under the heading "DESCRIBE ACCIDENT IN DETAIL" in the signed written accident report by defendant it was stated (as nearly as can be made out from a somewhat illegible copy):

"Driving in Right hand lane. Car ahead missed Seneca turn off & slowed abruptly—Slowed ch'd [changed—?] left lane behind and swung around her. Car Stopped immediately in front of me for a dog tried to miss him but could [n't—?] stop fast enough to miss car stopped in center lane."

In the space on the report headed "Distance Danger Noticed" a notation of fifty feet appears. Approximate speed of defendant's vehicle was indicated at forty to forty-five miles per hour.

On the report signed by decedent wherein the accident is described this appears:

"Going West on 54 appro 40 mi hr Driving in left Lane slow down to miss

dog—man in back of me on right hand lane turned left to miss woman who had changed her Mind not to turn on Seneca St."

The figures on decedent's report indicating approximate speed are marked over so that it is difficult to tell whether a figure of 10, 15, 20 or 25 was finally intended. This referred to speed at point of impact. Photographs of decedent's automobile showed the rear end thereof substantially damaged.

Defendant testified that he was driving west on Kellogg and further that:

"A. Well, as I approached the overpass on Seneca Street, I was in the right-hand lane, proceeding west. As I came over the overpass, which is humped like this (indicating), at some point over the—at some point while you're on this overpass, you can see below the overpass the exit that goes around and onto Seneca Street, headed south. And, as I recall, at that exit, there was a vehicle to the—with brake lights on, either stopped or making no visible forward progress. This immediately presents the problem of—since the exit is there—is this driver going to speed up—

. . . . . . . . . . . . . .

"A. I decided that rather than risk this car still being there when I arrived or even coming towards me in trying to get off at this exit, that it would be best to use the passing lane.

"Q. All right. Now had this car gone beyond the exit there at Seneca Street?

"A. It was at the exit or had just gone slightly by; I couldn't say whether it was at the exit or just by, but it was obvious that the driver either intended to get into this exit or had suddenly become aware of the fact that they had intended to, and had made an abrupt stop, as evidenced by the fact that the brake lights were on and the car was making no visible progress ahead.

"Q. All right. Was there anybody in the car?

"A. A woman was driving the car, and the heads of two little children were visible.

"Q. All right, sir. Then what did you do?

"A. Of course, to change lanes, it's necessary to know if there's somebody—

. . . . . . . . . . . . . .

"Q. What did you do, sir, please? What did you do?

"A. I looked in the rear view mirror and started, I would say, simultaneously, to pull into the passing lane.

"Q. All right, sir. That would be in the lane on your left?

"A. On the left-hand lane.

"Q. All right. Then what happened?

"A. As I started to, I would say, about the time I crossed the middle, the point leading into the next lane, brake lights on a car in the passing lane were on or came on, and this car appeared to stop or slow abruptly.

"Q. All right, sir. What did you do?

"A. Well, knowing that this car was—

"Q. Now not 'knowing'. Now I know you want to tell what you thought

and why you did it, but the Court says you must just say what you did at that time and what you saw. Just do that for us, please.

"A. I decided that neither lane—

"Q. Go ahead, sir, please. Do you remember the question?
"A. Yes. At this moment, I would have been braking the car slightly.
"Q. All right.
"A. At the moment that the forward progress of the vehicle in the left lane was obviously substantially less than mine, whether stopped or moving slightly, it was doubtful that I could stop at the time that I reached this vehicle.

"A. So I tried to go into the grass strip, in the medial (indicating), being the only place left to go.
"Q. All right.
"Mr. Michaud: Objection, Your Honor.
"The Court: Sustained as to that.
"Q. You tried to go into the grass strip, and what happened?
"A. Apparently was insufficient angle or insufficient speed to climb the curb.
"Q. All right. At least, your car wouldn't go over it?
"A. I couldn't get into the grass strip, so I immediately hit the brakes as hard as I could possibly brake a car.
"Q. All right. Then what happened?
"A. The car continued to skid until it hit the vehicle that was in the passing lane."

Defendant further testified that after one crested the overpass the vision was clear ahead and he was looking ahead, driving in the vicinity of forty-five miles per hour. He was traveling somewhere around two hundred feet from the woman's car. When he saw the brake lights of the woman's car he felt he couldn't stop and he decided to use the passing lane. He had no intentions of hitting the woman and two children in the automobile which had apparently stopped. Decedent was proceeding west on the inside traffic lane at a distance which he did not consider a hazard but which he would estimate as probably two hundred feet. He had checked that traffic lane, he looked in his rear view mirror and there was no car within a reasonable distance for pulling into the passing lane. Defendant applied his brakes twice. He was angling between the two traffic lanes when he saw the brake lights of decedent's car; as he crossed the center line he was braking his car. Decedent's car was then traveling noticeably slower but he could not say whether it was stopped or not. The woman and decedent did not slow simultaneously. Defendant then drove to the left to get over into the center grass strip but his wheels wouldn't go over the curb and he again applied his brakes and skidded into the rear of dece-

dent's car. Defendant did not see anything in front of decedent's car which would indicate why it was either slowed or stopped on the highway; he saw no dog and did not see the woman and the two children again. Defendant was questioned as to another written statement he had signed after the collision wherein he had stated decedent's car was about fifty feet west of where he was crossing the center of the lanes. He testified this was the first time he had noticed this car as a hazard, either stopped or slowed down. He further testified as follows:

"Q. Well, what judgment did you form at that time—that it was better to change lanes?

"A. That's correct.

"Q. And then you looked—the first thing you did was looked in your rear view mirror, isn't it?

"A. Yes, to clear the passing lane.

"Q. And you saw there was nobody at all behind you?

"A. Yes.

"Q. And there was nobody behind Mr. Johnston either then there at that time, was there?

"A. No.

"Q. And you then turned to go into the inside lane, is that right?

"A. That's right.

"Q. And at the very instant you turned, and as your car angled across to cross the center line, you first saw or noticed Mr. Johnston's car?

"A. I first noticed danger in connection with that car, yes.

"Q. First time you really noticed his car, it was called to your attention?

"A. First time it was called to my attention.

"Q. And at that very time his brake lights were on?

"A. Yes.

"Q. And he was fifty feet away?

"A. This was a guess, as all distances.

"Q. That was your estimate at that time?

"A. That was my estimate."

The written statement referred to above contained this item:

"At this point the driver had his brakes set apparently as there was a set of skid marks other than mine proceeding west from the point of impact according to the remarks made by the investigating officer."

There was other evidence pro and con as to decedent's injury and death, but on this state of the case each of the parties moved for a directed verdict upon the issue of liability. Defendant's motion was denied. Plaintiff's motion was sustained in part, the court's ruling thereon being most clearly embodied in its instruction No. 2 to the jury, as follows:

"You are instructed that the issue of defendant's negligence is removed from your consideration. You are instructed that the defendant was negligent and

that his negligence was the proximate cause of the accident, and you are instructed to return a verdict in favor of the plaintiff and against the defendant on plaintiff's first cause of action.

"The remaining issues in this trial for the jury to decide, therefore, are as follows:

"FIRST: The amount of damages to which plaintiff is entitled to recover on her first cause of action.

"SECOND: Whether or not the automobile accident between the defendant and Harold L. Johnston was a proximate cause of Harold L. Johnston's death on October 7, 1961.

"THIRD: If said automobile accident is found by you to have been a proximate cause of said Harold L. Johnston's death, then the amount of damages plaintiff is entitled to recover for such wrongful death."

Thus the court ruled as a matter of law not only that defendant was guilty of negligence which was a proximate cause of the collision but also that plaintiff's decedent was not guilty of contributory negligence, which defense had been asserted by defendant. We will consider rulings on these issues first. Without attempting any extended analysis of the evidence, which we have noted in detail, we are of opinion it was such as to require submission of these issues to the jury. It is only when different minds can reasonably arrive at but one result that fact issues become questions of law justifying a court in substituting its judgment for the jury. As stated in *Krentz v. Haney,* 187 Kan. 428, 357 P. 2d 793:

"The law favors trial by jury and the right should be carefully guarded against infringements. It is a right cherished by all free people. A trial court, in the exercise of its prerogative in determining questions of law only in these kinds of cases, should not usurp the power and function of the jury in weighing evidence and passing upon questions of fact." (p. 432.)

In *Casement v. Gearhart,* 189 Kan. 442, 370 P. 2d 95, it was held:

"In a negligence case where no evidence is presented, or the evidence presented is undisputed and is such that reasonable minds could not accept it as sufficient to establish the existence of a fact, it becomes the duty of the court to remove the issue from the jury.

"In reviewing the propriety of an order sustaining a motion for a directed verdict, or, as here, a motion for judgment upon the entire record, this court is required to resolve all facts and inferences reasonably to be drawn from evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon the motion must be denied and the matter submitted to the jury." (Syl. ¶¶ 1 & 2.)

On the question of contributory negligence, statutory duties aside, we think it was for the jury to determine whether under all the circumstances decedent was negligent and, if so, whether such negli-

gence contributed to the collision. Negligence is the lack of ordinary care. It is the failure of a person to do something that a reasonably careful person would do, or the act of a person in doing something that a reasonably careful person would not do, measured by all the circumstances then existing (see PIK, No. 3.01, p. 70). Thus we see the standard is the conduct of the reasonably careful person under the circumstances. The policy of the law has relegated the determination of this to the jury, to note the special circumstances of each particular case and then say whether the conduct is such as would be expected of a reasonably careful person under a similar state of affairs. Only when the facts are such that reasonable men must draw the same conclusion from them does the question of negligence become one of law for the court.

Evidence as to the actions of the decedent and the reasons therefor just prior to the collision is unfortunately meager. We know he stated he slowed or stopped because of a dog. We are inclined to the view that the mere presence of a dog upon a through highway is not sufficient as a matter of law to relieve a motorist of all liability for consequences of whatever evasive action he may take in behalf of the dog, but rather that this presents a question of fact for a jury to determine.

In *Kuether v. Locke*, 261 Minn. 41, 110 N. W. 2d 539, the plaintiff made a sudden stop when a dog ran into the street in front of her, and her automobile was thereupon struck from behind by defendant's auto. Plaintiff asserted that the jury should have been instructed she was free from negligence as a matter of law and that defendant was negligent as a matter of law. The court had this to say:

"An important and perhaps decisive distinction in all of these cases is the question of whether a collision with the animal will in itself endanger the occupants of the colliding vehicle and other persons in the area, or whether, because of the size of the animal involved, the only danger is to the animal itself. [p. 44]

. . . . . . . . . . . .

"The rule which we believe should govern the liability of a driver confronted with an emergency created by the appearance of a small animal such as a dog is stated in *Massie v. Barker*, 224 Mass. 420, 113 N. E. 199. The defendant in that case was driving a truck and as he was about to pass a wagon a large sheep dog jumped in front of the truck. In attempting to avoid the dog, the driver swerved the truck and hit the wagon, causing injuries to its occupants. In that case, as in this, 'the dog flashed by.' In holding that the negligence of the truckdriver was a question of fact for the jury, the Massachusetts court stated as follows (224 Mass. 423, 113 N. E. 199):

" 'The law as to drivers of motor vehicles is not different from that which governs other persons. The standard required is that of the reasonably prudent person under all the circumstances. If some unforeseen emergency occurs, which naturally would overpower the judgment of the ordinary careful driver of a motor vehicle, so that momentarily or for a time he is not capable of intelligent action and as a result injury is inflicted upon a third person, the driver is not negligent. The law does not require supernatural poise or self control. But no one safely can drive motor vehicles amid the distractions and dangers likely to be encountered on the modern highway and street who is not reasonably steady of nerve, quick in forming an opinion and calm in executing a design. Whether the conduct of the defendant's agent measured up to the standard of common caution for the driver of a motor vehicle under all the circumstances, was a question of fact.

" '. . . *Manifestly one exercising due care cannot hesitate in preferring the safety of human beings to that of dogs.*' (Italics supplied.) [pp. 45, 46]

. . . . . . . . . . . . .

"We therefore hold that when a driver is unexpectedly confronted with an animal on the highway, and a rear-end collision occurs as a result of his making a sudden stop to avoid striking the animal, it is a fact question for the jury as to whether the driver acted with reasonable care and prudence. In making its determination the jury should consider all of the surrounding circumstances, including the size of the animal and the likelihood of injury to the driver and passengers, or persons in a following vehicle, resulting from a collision with the animal, weighed against the possibility of injury which might occur from a sudden stop or from other evasive action to avoid the animal.

"In support of the plaintiff's claim that the defendant was negligent as a matter of law, she points to the testimony that defendant saw the children at the intersection, observed the dog, and noticed plaintiff's brake lights before the impact. In view of the plaintiff's own testimony that she saw the whole picture at one time in a fraction of a second, it can hardly be said that the defendant should have had a better opportunity than she to observe and comprehend the developments. Until and unless problems arise which should alert him to the possibility of a sudden stop in front of him, the driver of a following car need not assume that he will be required to bring his vehicle to an emergency stop without adequate warning. This is especially true on a through highway. We decline to hold that under the circumstances of this case the collision itself was conclusive evidence that defendant was not following at a reasonable distance or that he did not have his car under sufficient control. These were proper questions for the jury to determine." (p. 47.)

See, also, *Edwards v. Houston Transit Company*, 342 S. W. 2d 787 (Tex. Civ. App.), wherein it was held that the evidence presented a jury question as to whether a motorist, who had made a sudden stop because of a dog running in the street, and was struck in the rear by defendant's following bus, was guilty of contributory negligence as to stopping suddenly.

Moreover, on this question of contributory negligence we think it was jury work to determine whether there was any violation by

decedent of the duty imposed by K. S. A. 8-547 (c) which provides:

"No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal."

K. S. A. 8-549 provides that stop or decrease of speed signals given by hand and arm shall be by hand and arm extended downward, and further that stop signal lamps on the rear may be used in lieu of hand and arm signals, and that either may be used to indicate a stop or turn. It is definitely established that decedent had brake lights working on his car indicating the application of brakes. Plaintiff argues as a matter of law this was sufficient compliance with the statute 8-547 (c). Defendant claims he did not have adequate warning of decedent's sudden decrease in speed in order to prevent what occurred. It must be noted 8-547 (c) requires the giving of an *appropriate* signal when there is opportunity to give such signal.

Several of the states have statutes identical or virtually so to ours which have been construed. Minnesota is one.

In *Keuther v. Locke,* supra, the court stated:

"Defendant here testified that he did not have adequate warning of plaintiff's sudden stop although he believed the plaintiff's brake lights went on. Mrs. Keuther herself testified that as soon as she saw the dog she put the brake on as hard as she could. We hold that whether the momentary flashing of a brake light is 'appropriate' under the statute, or whether the circumstances called for a more effective signal, was a fact question for the jury. [p. 49.]

.   .   .   .   .   .   .   .   .   .   .   .

"What constitutes an appropriate signal must depend in every case on the necessity for, and the driver's opportunity to give, an effective warning commensurate with the probable hazards involved." (p. 50.)

In *Ryan v. Griffin,* 241 Minn. 91, 62 N. W. 2d 504, the court said this with respect to rear-end collisions:

"The driver of a leading automobile has no absolute legal right superior to the driver of the car following. The leading driver must exercise due care not to swerve, slow up, or stop without adequate warning of his intention to do so to the driver of the car following. The driver of the car following must exercise due care to avoid collision with the leading automobile. Just how close an automobile may be followed and what precautions a driver must take in the exercise of due care to avoid colliding with the automobile ahead and just what warnings the driver of the leading automobile must give in the exercise of due care before swerving, slowing up, or stopping cannot be stated in a fixed rule. In each case, except where reasonable minds may not differ, what due care requires and whether it has been exercised is for the jury." (pp. 94, 95.)

In *United States v. First Sec. Bank of Utah,* 208 F. 424 (10th Cir., Utah), 42, A. L. R. 2d 951, 959, the court, in construing identical Utah statutes respecting brake lights as a signal to stop, said:

"Vernon knew that the Mardis vehicle was following and overtaking him. The statute required Vernon to give an appropriate signal before stopping or suddenly decreasing his speed. No hand signal was given. It is urged that the visible light showing the application of Vernon's brakes complied with the statute. A fair inference to be drawn from the testimony of Mardis and his wife is that the brake light signal which was given by the Vernon automobile was simultaneous with its sudden decrease in speed. Under such circumstances, the signal was not effective and was not in compliance with the statute which provides that an appropriate signal must be given prior to stopping or suddenly decreasing the speed of a vehicle." (p. 429.)

In *White v. Rohrer,* (Sup. Ct., Mo.) 267 S. W. 2d 31, the court noted that the electric signal functions only on application of the brakes and in construing a statute similar to our own stated:

"Under the statute, the test of the sufficiency of a warning is whether it is 'timely,' and the form and character of the signal, whether by arm or by lights, depends upon the circumstances in which it is given, and the forward driver does not in all circumstances discharge the full measure of his duty to give a reasonably adequate or timely warning when he only employs his brake signals." (p. 35.)

And in *Johnson v. Hill,* 274 F. 2d 110 (8th Cir., N. D.) the court construed a North Dakota statute identical to our own holding that where a leading driver suddenly applied his brakes and there was a collision with the car behind, the failure of the first driver to signal until he depressed the brake pedal furnished an adequate basis for a finding that the flashing of the brake light was not an appropriate signal under the circumstances. We hold then that it was a jury question to determine whether an appropriate signal was given under the circumstances. In so doing we have not overlooked certain language in *Curtiss v. Fahle,* 157 Kan. 226, 139 P. 2d 827, indicating that the statute does not require two signals of intention to stop. The holding in that case was that one who has actual notice of decrease in speed as a specified distance has the same notice that a signal would have given him, and is not controlling here.

Turning to the question of whether the court erred in holding as a matter of law that the defendant was guilty of negligence which was the proximate cause of the collision, much of what has already been said is pertinent and will indicate our belief that the evidence was such that minds of reasonable men could reach different conclusions on these questions.

The case of *Hill v. Hill,* 168 Kan. 639, 215 P. 2d 159, involved a rear-end collision wherein it was claimed the driver of the following car was guilty of negligence as a matter of law. This court in rejecting that contention said:

"Appellant attempts to invoke the rule that a driver of a motor vehicle must so operate his vehicle that he can safely stop within the distance that he can clearly see any other vehicular traffic in the roadway ahead of him. That is a well established rule, but it does not apply to the situation where a sudden emergency arises, as by the sudden application of brakes and sudden stop without warning of another vehicle just ahead." (p. 641.)

In *Lechleitner v. Cummings,* 160 Kan. 453, 163 P. 2d 423, in which defendant collided with the rear of plaintiff's car which had suddenly slowed to ten miles per hour, this court said: "Whether either was guilty of negligence was a fair question for the jury." (p. 456.)

In short, this case presents a rather unusual factual situation wherein there was evidence of two sudden stops upon a through highway, and we believe the jury should be permitted to analyze the evidence and determine the issues of negligence on the part of both decedent and defendant and the issue of proximate cause of the collision.

Defendant further contends his motion for directed verdict insofar as liability for wrongful death (plaintiff's second cause of action) should have been sustained. The trial court did submit the question of causal connection between the collision and the death to the jury for its determination. Defendant concedes a question of fact for the jury existed as to whether decedent suffered any injury in the collision, but he claims there was no evidence upon which a finding of death caused by the collision could have been made. Decedent died from cerebral hemorrhage seven weeks after the collision. For a number of years he had suffered from severe hypertension, obesity and early congestive heart failure and had been treated therefor. Immediately after the collision decedent indicated he was not hurt but he was sleepless that night with pain and nervousness. He consulted his family doctor the second day and was hospitalized and referred to an orthopedic surgeon. We shall not go into the medical evidence at length, although there was considerable. Suffice it to say there was positive medical opinion from his family doctor that there was a causal connection between the death and the collision in that the collision aggravated the hypertension which resulted in the cerebral hemorrhage. There

was also positive medical opinion from a specialist in internal medicine, testifying hypothetically, to the same effect. The latter further opined in a written statement:

"I feel that the accident and its subsequent emotional changes caused an exacerbation of the patient's hypertensive disease and probably hastened his death."

The fact there was evidence as to other possibilities which might have caused death does not mitigate from the essential character of this evidence. We think the evidence presented a jury question and conclude the trial court committed no error in denying defendant's motion for directed verdict as to plaintiff's second cause of action.

Defendant raises other contentions of error. Some relate to requested instructions inherently foreclosed in the direction of verdict for plaintiff by the trial court and need not be further discussed. Some we need not reach as the court is of opinion a new trial should be granted as to all issues including damages. The others we have considered but find no error.

One further matter needs to be noticed. We are confronted with a record on appeal in this case of 383 pages. Virtually all of the testimony of witnesses is in verbatim question and answer form, accounting for most of the record, and is placed in the record by defendant. Rule No. 6 ( c ) of this court provides in part:

"Testimony of witnesses designed for inclusion should be in narrative form except that testimony must be included with verbal accuracy whenever the decision of any question in controversy may be affected thereby."

No motion for advancement of costs was presented to the trial court but plaintiff brings the matter to our attention. Obviously this was a lengthy trial, and the court appreciates the difficult task of counsel in deciding how the testimony of witnesses may be presented most effectively to an appellate court, and the natural apprehension lest too little be included. The court realizes that great latitude must necessarily be left with the advocate in determining when verbal accuracy is required, and that there are instances wherein it is essential that questions and answers be reproduced in order to understand and assess properly such testimony. However, everything considered in the instant case, the court feels there is a substantial breach of the aforesaid rule in the inclusion at great length of unnecessary verbatim testimony which could have been omitted or condensed in narrative form, such inclusion not being essential to the determination of any question in controversy. Ac-

cordingly, pursuant to Rule Nos. 3 and 6 ($e$), the costs of the record on appeal will be assessed two-thirds to the defendant and one-third to the plaintiff, balance of costs of appeal to be assessed against plaintiff.

The judgment and the order denying motion for new trial are reversed with directions to grant a new trial generally on all issues in accordance with the views herein expressed.

APPROVED BY THE COURT.