FLIGHT CONCEPTS LIMITED PARTNERSHIP, Russell P. O'Quinn, Gilman A. Hill and The Skyfox Corporation, Plaintiffs,

v.

The BOEING COMPANY and Boeing Military Airplane Company, Defendants.

No. 89–4173–RDR.

United States District Court, D. Kansas.

April 29, 1993.

Paul B. Swartz, William Robert Martin, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, KS, Martin G. Wehrli, Rutter, O'Sullivan, Greene & Hobbs, Los Angeles, CA, for plaintiffs.

J. Steven Massoni, Gerald Sawatzky, Foulston & Siefkin, Robert S. Goudy, [term 10/19/90], Elvir A. Fay, [term 10/19/90], William J. Joyce, Wichita, KS, for defendants.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a diversity action in which plaintiffs allege claims of breach of contract and fraud. This matter is presently before the court upon defendant's motion for summary judgment. The parties have provided the court with a mountain of paperwork in support of their positions. The court has undertaken the herculean task of reading and analyzing this material. The court has also heard extensive oral argument on this motion. Having spent considerable time digesting the materials submitted to the court, we are now prepared to rule.

This action arises from some dealings between Flight Concepts Limited Partnership and The Boeing Company concerning the production and sale of an airplane, the Skyfox, that was designed by Flight Concepts. Ultimately, Boeing was given the exclusive right to produce and sell the Skyfox. Boeing never produced or sold a Skyfox plane and subsequently terminated its agreement with Flight Concepts two years after making it. Plaintiffs contend that Boeing improperly terminated the agreement, and they seek damages in this action.

In considering the defendant's motion for summary judgment, the court must examine all the evidence in the light most favorable to the plaintiffs. *Barber v. General Electric Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981). Summary judgment is proper only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this rule, the initial burden is on the moving party to show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party's burden may be met when that party identifies those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552.

Once the moving party has met these requirements, the burden shifts to the party resisting the motion. The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The party resisting the motion "may not rest upon the mere allegations or denials of his pleadings ..." to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence will not avoid summary judgment; there must be sufficient

evidence on which a jury could reasonably find for the nonmoving party. *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

Many of the facts are not in dispute here. The court will briefly summarize some of the pertinent facts and then consider the facts that remain in dispute.

Plaintiff Russell O'Quinn is an experienced test pilot, aircraft designer and flight engineer. Plaintiff Gilman Hill has masters degrees in geology and physics and since the 1960s has been involved in several projects concerning the modification of light aircraft. In the early 1970s, O'Quinn conceived the idea of a multirole aircraft for use by foreign nations as well as the United States. Based upon his knowledge and experience with the Lockheed T–33, he concluded that the existing airframes of the T–33s could be modified to fit the role of the multirole aircraft he envisioned. He approached the Italian government and several aircraft manufacturers in the United States, including Lockheed and McDonnell Douglas, with his ideas. He was unable to reach an agreement with the Italian government, and the aircraft manufacturers he contacted in the United States were unable to provide him the funding needed for his project. In 1981, O'Quinn met Hill and explained his concept to him. Hill agreed to invest $1.25 million in the project, and they formed a partnership named Flight Concepts Limited Partnership. Flight Concepts is a limited partnership in which O'Quinn and Hill are both general partners and limited partners. In 1982, O'Quinn began putting together a team of retired Lockheed personnel who had been involved in the test flight of the original T–33 to assist in the actual design of the modified T–33, which soon became known as Skyfox. O'Quinn and Hill subsequently formed The Skyfox Corporation. The Skyfox design replaced the single jet engine on the T–33 body with two jet engines, added a new nose and made other changes to increase the performance, range and fuel efficiency of the T–33. Plaintiffs suggest that the Skyfox is "a formidable competitor to the world's most advanced tac-tical fighters which cost from $10 million to $25 million per aircraft."

O'Quinn approached several aircraft manufacturers in the early 1980's with the Skyfox airplane. They expressed some interest but ultimately declined to pursue the project. In January 1985, Flight Concepts personnel contacted Boeing. A presentation was made to employees with The Boeing Military Airplane Company (BMAC) in Wichita, Kansas. BMAC employees were excited about the Skyfox aircraft and several additional meetings were conducted. A Memorandum of Understanding (MOU) was executed on April 2, 1985 in which Boeing and the Skyfox entities agreed to enter into an exclusive agreement to establish a program to identify, evaluate and pursue potential customers for the Skyfox aircraft. The MOU also provided that the parties would proceed in three succeeding phases but would not be partners. BMAC later advised the Skyfox group in June or July that the April MOU was not valid because Alan Fenwick did not have the authority to sign the agreement. The April MOU expired on July 1, 1985 on its own terms. On July 1, 1985, another agreement was executed by the parties. This agreement provided, *inter alia,* as follows:

5. That Skyfox agrees that BMAC shall continue to explore the feasibility of the Program and accordingly, it is the current intention of the parties to complete a feasibility assessment for said program and explore any possible basis for a contractual relationship.

6. That unless a firm contractual agreement is established between the parties which has the approval of BMAC management, the President of BMAC and the Corporation Director of Contracts, this cooperative exploratory effort shall terminate on 1 December 1985.

The parties then began negotiating a license agreement. Loyd Pearcy, a Denver attorney, handled the negotiations for the Skyfox group, and Steve Larsen was Boeing's authorized contract negotiator. A Patent and Know–How License Agreement ("License Agreement") was subsequently entered into by the parties on November 27, 1985. The License Agreement provided that Boe-

ing would have "an exclusive, worldwide right and license to utilize Licensor's Know–How and the inventions of Licensed Patents in the manufacture, use and sale of licensed product(s) and any and all other substantial rights." It also required BMAC to pay a royalty of $150,000 upon the sale of any Skyfox aircraft for a period of ten years from the date of the first sale. The parties also executed another MOU on November 27, 1985. The parties had entered into a Proprietary Data Exchange Agreement to protect the confidentiality of each party's data effective November 1, 1985.

On December 27, 1987, BMAC sent a letter to O'Quinn terminating the License Agreement in sixty days. The Skyfox was never produced during the period of the License Agreement.

Plaintiffs filed this action on August 18, 1989. The complaint contains four causes of action: (1) breach of the license agreement; (2) breach of a fiduciary relationship based upon a joint venture by the parties; (3) fraud; and (4) failure to return data, documents and parts. Plaintiffs seek $67,500,000 in damages and return of certain data, documents and parts. The License Agreement provided that plaintiffs would receive $150,000 in royalties for each Skyfox airplane sold by the defendant. Plaintiffs allege that their research showed that 450 planes would have been sold by Boeing. Therefore, they contend that they are entitled to $67,500,000 [450 × $150,000 = $67,500,000] in damages.

There is considerable dispute as to what occurred between November 27, 1985 and December 27, 1987. The facts concerning what occurred during that time period are irrelevant to the issues raised in the defendant's motion for summary judgment, so the court shall not address them.

## MOTION FOR SUMMARY JUDGMENT

The crux of this case concerns the various agreements that were entered into by the parties. Boeing contends that these agreements allowed it to terminate the License Agreement on December 27, 1987 and that no breach of the agreement occurred at that time or at any time prior to that date. It also asserts that no fiduciary relationship existed, no joint venture existed, and no

fraud occurred during the negotiation and execution of the license agreement or at anytime thereafter. Plaintiffs contend that genuine issues of fact remain on all of these issues so that summary judgment should not be granted. Plaintiffs assert that defendants violated an implied covenant to use its best efforts to produce the Skyfox. They also allege that the License Agreement is either ambiguous, illusory or was procured by Boeing's fraud and misrepresentations. They further contend that a joint venture was created and that Boeing violated its fiduciary duties in this case.

The provisions of the License Agreement provide the starting point for an analysis of the arguments of the parties. Article XIII provides as follows:

*No obligation on Boeing to produce.* It is the intent of the parties hereto, in consideration of the terms and conditions herein, that BMAC shall be under no obligation whatsoever to produce and/or sell Licensed Product(s) and/or any product utilizing Licensor's Know–How during any part of the term of this License Agreement, and the License Agreement shall not be terminable by Licensor for BMAC's failure to produce and/or sell Licensed Product(s) and/or any product utilizing Licensor's Know–How.

Article X(3) provides as follows:

BMAC shall have the right to terminate this Agreement by giving Licensor 60 days notice in writing of such termination, and upon expiration of said 60 days this Agreement shall automatically be terminated. Notwithstanding, however, Flight Concepts will be entitled to any royalties which may be owed as provided in Article V herein.

Article XIV(4), which appears immediately above the signatures of O'Quinn and Hill, reads as follows:

This Agreement embodies the entire understanding between the parties as to a Patent and Know–How License and there are no prior representations, warranties or agreement between the parties relating hereto except for other agreements in writing entered into or which may be en-

tered into between BMAC and Licensor and this Agreement is executed and delivered upon the basis of this understanding. No alteration, waiver or change in any of the terms hereof subsequent to the execution hereof claimed to have been made by any representative of either party shall have any force or effect unless in writing signed by the parties hereto or their duly authorized agents or representatives.

The MOU executed on the same date as the License Agreement provides, *inter alia*, as follows:

> BMAC agrees to re-convey and/or sublicense back to Flight Concepts the right to Licensed Patents and Know–How which Flight Concepts has assigned or will assign to BMAC in connection with the Skyfox Program ... (a) In the event the Skyfox Program is terminated according to the terms of the Patent and Know–How License agreement.

The Proprietary Data Exchange Agreement provides, *inter alia*, as follows:

> 11. Nothing in this agreement shall grant to either party the right to make commitments of any kind on behalf of the other party. This agreement is not intended to be, nor shall it be construed as, a joint venture, partnership or other formal business organization. Further, the disclosure of proprietary data hereunder by either party to the other party shall not be construed as granting to either receiving party either a license under any patent or patent application or any right of ownership in such proprietary data....

Paragraph 19 of the Proprietary Data Exchange Agreement also contains the following integration clause:

> This constitutes a completely integrated Agreement between the parties relative to the Program and the exchange of Proprietary Data concerning the Program, and it supersedes any prior or contemporaneous written or oral agreement relative to the Program and may not be amended or modified except by subsequent agreement in writing executed by duly authorized officers or representatives of the parties.

With this background, we shall turn to the issues contained in defendant's motion for summary judgment. Boeing begins by arguing that the written agreements are enforceable according to their terms. Boeing asserts that the provisions of the License Agreement provided that it had no duty to exploit, sell or market the Skyfox and that it had the right to terminate the project at any time after giving sixty days notice. It asserts that since the contract is not ambiguous on these points, then no parol evidence is admissible concerning the negotiations or the execution of the document.

### I.

■ The law in Kansas is clear that competent parties may make contracts in their own terms, and in the absence of fraud, mistake or duress a party who has entered into such a contract is bound. *Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc.*, 227 Kan. 469, 608 P.2d 890, 895 (1980). Parol evidence concerning the terms of an agreement is not admissible in the absence of ambiguity or fraud. *Burge v. Frey*, 545 F.Supp. 1160, 1170 (D.Kan.1982). Plaintiffs assert that parol evidence is admissible here because they have alleged fraud and the contract is ambiguous.

### A.

■ The determination of whether a contract is ambiguous is a matter of law to be decided by the court. *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 508 P.2d 889, 895 (1973). As a general rule, if the language of a contract is clear and can be carried out as written, there is no room for rules of construction. *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 829 P.2d 884, 888 (1992). "To be ambiguous, a contract must contain a provision or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Farm Bureau Mutual Insurance Co. v. Old Hickory Casualty Insurance Co.*, 248 Kan. 657, 810 P.2d 283, 287 (1991). Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the document leaves it generally uncertain which

one or two or more meanings is the proper meaning. *Id.*

■ The alleged ambiguity in the License Agreement is not entirely clear from reading the plaintiffs' brief. The plaintiffs' argument is contained in the following excerpt from its memorandum in response to defendant's motion for summary judgment:

> The instrument, viewed in its entirety, reveals that the parties intended that Boeing would make or manufacture, use, and sell the licensed product, the Skyfox aircraft. Boeing expressly represented that it was in the business of developing technologies concerning building, modifying and marketing airplanes, and that it desired to obtain an exclusive worldwide license to the licensed patents and licensor's know-how. The plain meaning of these recitals is that Boeing desired to obtain the exclusive worldwide license so that it could exclusively develop the product. Additionally, the license is replete with references to Boeing's "manufacture, use, and sale" of the licensed product. *See* Article I(4); Article II(1), (2); Article V (1), (2); Article VII(5). The license further contemplates that Boeing would fund research and/or development work relating to the licensed product. *See* Article IV(2). It also conditions the payment of royalties upon the sale of the licensed products. *See* Article V(1), (2), (3). Similarly, Article VI, concerning royalty reports and payments, refers to the commercial sale of the licensed products by Boeing. Further, Article XII, entitled "Excusable Delay or Default," sets forth the conditions under which Boeing shall not be liable for any delay or default in performing. If Boeing had no duty whatsoever to perform under the license, it would have been unnecessary to include this provision in the contract.

In a nutshell, plaintiffs appear to contend that the agreement is ambiguous because it included the language contained in Article XIII in an exclusive license agreement. We fail to follow the plaintiffs' reasoning. The court has carefully examined the License Agreement and we find that it is free from ambiguity. The language contained in Article XIII is clear and unambiguous. This provision clearly states that Boeing is under no duty to produce the Skyfox. Moreover, Article X(3) clearly allows Boeing to terminate the agreement at any time upon sixty days notice. These provisions can be construed in only one way. In sum, we find no ambiguity in the provisions of the License Agreement.

### B.

Plaintiffs have asserted claims of fraud by affirmative misrepresentations and by concealment. Plaintiffs apparently have several purposes in making these allegations. First, they contend that the presence of fraud allows the use of parol evidence in interpreting the terms of the License Agreement. Second, they argue that they were fraudulently induced to sign the License Agreement.[1] Finally, they assert independent tort claims of fraud and misrepresentation.

The nature of plaintiffs' claims of affirmative fraud are similar. Although stated in several different ways, the claims are essentially that Boeing represented that it would spend large amounts of money on the Skyfox project. Specifically, plaintiffs allege Boeing or its employees made the following fraudulent misrepresentations: (1) that Boeing would invest between $25 million and $60 million for technical development, planning, manufacturing and marketing the Skyfox airplane; (2) that with the level of investment

---

1. This argument appears to be related to the plaintiffs' assertion that the presence of fraud allows the use of parol evidence to interpret the terms of the License Agreement. However, parol evidence in this context is ordinarily used to demonstrate the nonexistence of a binding contract. *See Agristor Leasing v. Bertholf,* 753 F.Supp. 881, 894–95 (D.Kan.1990). A contract which is fraudulently induced is usually declared void. *Albers v. Nelson,* 248 Kan. 575, 809 P.2d 1194, 1198 (1991). *See also Restatement (Sec-* *ond) of Contracts* § 164(1). Reformation or restitution may also be a remedy in some circumstances. *See Restatement (Second) of Contracts* § 165; Calamari and Perillo, *Contracts* § 9–23 (3d ed. 1987). Here, plaintiffs seek damages based upon the terms of the License Agreement. They do not ask that the contract be rendered void or that it be reformed. Nevertheless, the court shall consider plaintiffs' claim of fraud in the inducement.

by Boeing, plaintiffs could be satisfied that Boeing would not abandon the project; and (3) that plaintiffs would be pleased and satisfied with Boeing's execution of the Skyfox project. Plaintiffs also assert that the following misrepresentations were made concerning Article XIII of the License Agreement: (1) that the purpose of Article XIII was to make it clear that plaintiff could not terminate the License Agreement if Boeing failed to produce a certain number of aircraft within a specified time period; and (2) that, while Boeing insisted on the inclusion of Article XIII because of Boeing's willingness to make a large investment in the project, Article XIII should not cause plaintiffs any concern. Finally, plaintiffs contend that Boeing committed fraud by failing to disclose that (1) Boeing had its own project, Project Vision, which competed with the Skyfox program; and (2) Boeing was illegally dealing in classified and secret Pentagon documents. Plaintiffs allege that Boeing had a duty to disclose these matters to them because a fiduciary relationship had been established between the plaintiffs and Boeing either because (1) there was a disparity of bargaining powers or expertise between the parties, or (2) the parties had entered into a joint venture.

The court shall address the alleged fraudulent misrepresentations as we sort through the various theories articulated by the plaintiffs. For the purposes of this motion, the court shall generally assume that there is evidence that Boeing or its agents made the statements alleged by the plaintiffs.[2] We do note that there is some dispute as to the authority of some of the Boeing employees to make certain statements, but we need not address that issue in this memorandum.

Plaintiffs contend that Boeing fraudulently induced them to sign the License Agreement both by affirmative representations and by concealment of certain facts. In this regard, they point to the representations that were made at times prior to the signing of the License Agreement and to representations that were made at the execution of the License Agreement. At the signing of the License Agreement, plaintiffs assert that O'Quinn was hurried into not reading the agreement, was not advised that the agreement contained Article XIII, and was induced to sign the agreement by representations made by Boeing's employees that the agreement did not contain anything that would hurt him and that Boeing would spend a fortune on the project.

In *Albers*, the Kansas Supreme Court outlined the general parameters of fraud in Kansas as follows:

> Fraudulent misrepresentation includes affirmative acts and misstatements of fact or the concealment of acts or facts which legally or equitably should be revealed. *Citizens State Bank v. Gilmore*, 226 Kan. [662] at 667, 603 P.2d 605 [ (1979) ]. Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, which is made with the

**2.** The court readily notes that the evidence in the record in support of some of the allegations is non-existent. For example, the record fails to provide any significant support for the plaintiffs' position that Boeing promised to spend $60 million on the Skyfox project. The following excerpt from the deposition of Loyd Pearcy, the plaintiffs' designated negotiator in this transaction, reveals the weakness of plaintiffs' claim:

Q ... Now, was there ever any promise made in any of your meetings by Boeing, any flat promises that Boeing would invest a specific amount or amounts of money in the project?
A Not any flat promises, but, you know, I think there was implications and that occasion was one, that the way I interpreted that this whole motive for making the chart was look how much we're going to go into the hole as sort of a litmus test of our commitment to this project and that's how I interpreted it at the time.

Q Well, you said there were no flat promises. They were merely speaking that if the thing, if the Skyfox went into production it would take this much money, wasn't that it?
A Yes.
Q And there was no commitment at that point in time that they would put the Skyfox into production?
A No. You know, I—no question there was no commitment and I wouldn't try to mislead anyone about that and they were very well represented legally and there's no question about that. I guess it's sort of beyond my area of a lawyer, as a lawyer, but again the context was if we can get Boeing to buy this project, if we can get over these hurdles of it being somebody else's plane, et cetera, then we are committed to it and look how much money we're gonna spend. That's how I interpreted it anyway.

intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage. *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980).

809 P.2d at 1197–98.

The court shall begin by considering plaintiffs' claims that they were fraudulently induced to sign the License Agreement by Boeing because Boeing failed to disclose the aforementioned matters. The examination of this issue requires the court to consider plaintiffs' allegations of a fiduciary relationship and a joint venture.

■■■■ To establish fraud by concealment or silence, a plaintiff must demonstrate the following elements by clear and convincing evidence: (1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff. *Lesser v. Neosho County Community College,* 741 F.Supp. 854, 863 (D.Kan.1990). The duty to disclose arises when a fiduciary relationship exists between the contracting parties or when there is a disparity of bargaining powers or expertise between contracting parties. *DuShane v. Union National Bank,* 223 Kan. 755, 576 P.2d 674, 679 (1978). *See also Chiarella v. United States,* 445 U.S. 222, 227–28, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (duty to disclose arises when one party has information that other party is entitled to know because of fiduciary relationship or other similar relation of trust and confidence between them).

■■■■ Under Kansas law, a fiduciary relationship is never presumed, but must be proved by clear and convincing evidence. *Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir.1990), *cert. denied,* — U.S. —,

111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). Fiduciary obligations should be extended reluctantly to commercial or business transactions. *Pizza Management, Inc. v. Pizza Hut, Inc.,* 737 F.Supp. 1154, 1183 (D.Kan. 1990).

There are two types of fiduciary relationships generally recognized in Kansas: "(1) those specifically created by contract such as principal and agent, attorney and client, and trustee cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor and administrator of an estate, among others and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions." *Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235, 1241 (1982).

In this case, we are concerned with the second type of fiduciary relationship listed in *Denison State Bank.* In *Rajala,* the court summarized the law in Kansas concerning this type of fiduciary relationship as follows:

Determination of whether this second type of fiduciary relationship " 'exists depends on the facts and circumstances of each individual case. [The Supreme Court of Kansas] has refused, for that reason, to give an exact definition to fiduciary relations.' " *Id.* (quoting *Curtis v. Freden,* 224 Kan. 646, 651, 585 P.2d 993, 998 (1978)). Although such fiduciary relationships cannot be defined with precision, the Supreme Court of Kansas has prescribed "certain broad principles which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation:

A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property,

interest or authority of the other is *placed in the charge of the fiduciary. Id.* (emphasis in original).

The court in *Denison* made clear that each of the general considerations listed above need not be present in every case in which a fiduciary relationship is alleged. However, the court emphasized that an overriding consideration in the law of fiduciary relationships was that "one may not abandon all caution and responsibility for his own protection and *unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.*" *Denison,* 230 Kan. at 696, 640 P.2d at 1243–44 (emphasis added). The court went on to state that "[t]his is particularly true when one . . . is fully competent and able to protect his own interests." *Id.*

A fiduciary relationship whereby both parties assume fiduciary obligations to each other or to a common entity similarly requires a conscious assumption of fiduciary obligations by the parties. For example, in *Paul v. North,* 191 Kan. 163, 380 P.2d 421 (1963), the Supreme Court of Kansas stated that fiduciary relationships

> "may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties. . . . But they necessarily spring from an attitude of trust and confidence and *are based upon some form of agreement, either expressed or implied, from which it can be said that the minds have met in a manner to create mutual obligations.*"

*Id.* 191 Kan. at 170, 380 P.2d at 426 (citations omitted) (emphasis added). Although a fiduciary relationship may arise out of an agreement to act together for the mutual benefit of the parties, such a relationship cannot be established by accident or inadvertence.

> "Mere concert of action without more, does not establish a fiduciary relationship. . . . Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they *willingly and knowingly act for one another in a manner to*

*impose mutual trust and confidence that a fiduciary relationship arises.*"

*Wolf v. Brungardt,* 215 Kan. 272, 285, 524 P.2d 726, 736 (1974) (emphasis added).

This court has also recognized that conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law. *See Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384, 1387 n. 3 (10th Cir.1987); *cf.* 36A C.J.S. *Fiduciary,* 385 (1955) ("As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship") (footnotes omitted)."

919 F.2d at 614–15.

■ In evaluating the evidence presently before the court, we find insufficient evidence of a fiduciary relationship. Plaintiffs' suggestion that a fiduciary relationship existed must fail for several reasons. There is no evidence that Boeing ever "consciously assumed" fiduciary duties as to O'Quinn, Hill or any of their entities. There is nothing in any of the agreements entered into by these parties that suggests that plaintiffs placed their property or business in Boeing's hands to operate primarily for plaintiffs' advantage. To the contrary, all of the agreements make clear that the relationship between the parties was arm's length for the mutual but separate benefit of the plaintiffs and the defendant. Moreover, even if the terms of an agreement are extremely disadvantageous to the party who claims to have been injured, no fiduciary relationship arises unless the party who has been harmed is characterized by inferiority due to dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions. *Denison State Bank,* 640 P.2d at 1241. These circumstances, of course, are wholly inapplicable here. O'Quinn and Hill were experienced and intelligent businessmen. They were represented at all times by counsel in their dealings with Boeing. They were fully competent and able to represent their own interests. They were not so lacking in basic skills as to require

imposition of a fiduciary relationship upon Boeing.

In *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985), the court considered the question of the existence of a fiduciary relationship under similar circumstances. In that case, Dr. McLean patented an aerospace device in the area of satellite technology. Dr. McLean and Finch, the co-owner of the patent and an attorney, entered into negotiations with Hughes Aircraft to explore the market potential of the invention. They subsequently entered into a license agreement with Hughes giving Hughes certain rights in the patent and obligating Hughes to pay royalties to Finch and McLean. After Dr. McLean's death, Finch and McLean's trustees brought an action against Hughes claiming that they had been fraudulently induced into signing the license agreement, and that a fiduciary relationship had been created between the licensors and the licensee. The court concluded that plaintiffs' allegation that a confidential relationship existed between the inventor and Hughes was "simply frivolous." *Id.*, 469 A.2d at 889. The court noted that it was clear that none of the licensors intended for Hughes to look out after their interests. *Id.*, 469 A.2d at 889–90. The licensors knew that they were negotiating with Hughes on an arm's length basis. *Id.*, 469 A.2d at 890. The holding of *Finch* is equally applicable here given virtually the same circumstances. In sum, we do not find sufficient evidence of a fiduciary relationship between the plaintiffs and the defendant.

■■■ Plaintiffs have also suggested that a joint venture was created between the parties. A joint venture is an association of two or more persons or corporations to carry out a single business enterprise for profit; it may be found in the mutual acts or the conduct of the parties. *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P.2d 824, 827 (1964). The burden of proving a joint venture rests upon the party asserting its existence. *Curtis v. Hanna*, 143 Kan. 186, 53 P.2d 795, 796 (1936). The following factors are indicative of a joint venture, but no

single factor is controlling: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 596 P.2d 816, 823 (1979).

In support of their position that a joint venture was created, plaintiffs point to Boeing's employment of O'Quinn during the months after the License Agreement was signed. They further contend that the following clause contained in the November MOU supports the creation of a joint venture:

> BMAC hereby agrees that Russell P. O'Quinn shall participate as pilot of the Skyfox Prototype Aircraft, (and any successor demonstration and/or test aircraft) on a co-equal basis; provided however, all specific flight assignments shall require prior authorization from BMAC's Skyfox Program Manager.

■■■ The evidence in this case fails to reveal the presence of a joint venture. In fact, the evidence overwhelmingly supports the position that the plaintiffs and the defendant did not enter into a joint venture in their agreements or by virtue of their conduct. The application of the aforementioned factors set forth in *Modern Air Conditioning* clearly reveals that a joint venture was not present here. The evidence shows no joint ownership of property or sharing of profit or losses. The parties entered into specific agreements concerning the ownership of the property involved, including entering into a lease agreement on the Skyfox prototype. There was no sharing of profit or losses since the License Agreement provided that the plaintiffs would be paid a royalty for the sale of each airplane. Such a plan is inconsistent with a joint venture. The salary paid to O'Quinn for his assistance with the Skyfox project adds support to the conclusion that the parties did not intend to share the ex-

penses, profits and losses of the project. There was no community of control over the management and direction of the business enterprise. The License Agreement spelled out the duties and responsibilities of the parties, and this agreement does not reflect a community of interest or common business undertaking. The clause from the November MOU referred to by the plaintiffs concerning the participation of O'Quinn as a pilot for the Skyfox prototype provides additional support for this conclusion contrary to the assertions of the plaintiffs. This clause specifically provides that BMAC will remain in control of all flight assignments. Finally, the parties, in the Proprietary Data Exchange Agreement, expressly stated that their intention was not to enter into a joint venture. The facts in the record, even when viewed in the light most favorable to the plaintiffs, fail to support the presence of a joint venture here.

With the finding that no fiduciary relationship or joint venture existed between the parties, the court shall grant summary judgment to the defendant based on plaintiffs' claims of fraud by concealment or silence. The court shall also grant summary judgment to the defendant on plaintiffs' claims of breach of fiduciary duty.

 We next turn to plaintiffs' claims that they were fraudulently induced to enter into the License Agreement based upon the affirmative misrepresentations made by Boeing and its agents. Contracting parties have a duty to learn and know the contents of a written contract before signing it. *Vanier v. Ponsoldt,* 251 Kan. 88, 833 P.2d 949, 959 (1992). "Where contracting parties have carried out negotiations and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights." *Albers,* 809 P.2d at 1197. The fact that a party signs a contract and does not know its contents is not alone sufficient to permit that party to void it. *Id.* In addition, the fact that the signing of a contract may be hurried or rushed is not alone sufficient to permit a contracting party to void it. *Id.* at 1198.

 The facts here fail to demonstrate that the plaintiffs were induced to sign the License Agreement based upon the fraudulent representations of Boeing and its agents. Hill and O'Quinn are experienced and astute businessmen. Hill read the License Agreement, conferred with counsel, and signed it. O'Quinn also conferred with counsel prior to signing the agreement. He was told by his attorney, who was responsible for negotiating the License Agreement on his behalf, that this agreement was the best he was going to get from Boeing. We cannot say that these facts, even when viewed in the light most favorable to plaintiffs, suggest that plaintiffs could have justifiably relied upon any of the statements made by Boeing or its agents. In sum, we find insufficient evidence of fraudulent inducement by Boeing or its agents to avoid summary judgment.

Finally, we shall consider the plaintiffs' remaining allegations of fraud. The defendant contends that it is entitled to summary judgment on these claims because (1) the alleged statements are not actionable; (2) there is no clear and convincing evidence that Boeing made any promise that it did not intend to fulfill; and (3) the License Agreement precludes any reliance upon the alleged oral statements.

The court shall begin by considering the defendant's argument that there is a lack of evidence concerning the defendant's intention to perform the alleged oral promises. The defendant's position is that all of the fraud allegations made by the plaintiffs involve promises or statements concerning future events. They suggest that these claims are not actionable because the plaintiffs have no evidence that Boeing did not intend to perform the promises when they were made. Plaintiffs contend that their fraud claims related to future income and profits are actionable. They rely upon *Hawthorn–Mellody, Inc. v. Driessen,* 213 Kan. 791, 518 P.2d 446 (1974) and *Fisher v. Mr. Harold's Hair Lab, Inc.,* 215 Kan. 515, 527 P.2d 1026 (1974).

 Generally, fraudulent representations to constitute actionable fraud must relate to some material past or existing fact. *Timi v. Prescott State Bank,* 220 Kan. 377, 553 P.2d 315, 325 (1976). In order to prove a

claim for fraud relating to future events, a plaintiff must show that the defendant had no intention of performing his promise at the time he made it. *Modern Air Conditioning,* 596 P.2d at 824. There must be more than mere nonperformance to show fraudulent intent. *Id.* The gravamen of such a claim is the existence of other circumstances of substantial character which support an inference of wrongful intent at the time of making the representation. *Young v. Hecht,* 3 Kan. App.2d 510, 597 P.2d 682, 688 (1979).

▆ Having carefully reviewed the materials before the court, we fail to find evidence that Boeing did not intend to perform at the time the statements were made. In fact, the evidence presented by the plaintiffs is to the contrary. They suggest that all Boeing employees were enthusiastic about the Skyfox program. They point to a wealth of evidence demonstrating Boeing's enthusiasm for the Skyfox project and their desire to see it succeed. Moreover, plaintiff O'Quinn has plainly acknowledged that he has no evidence that Boeing did not intend to perform the promises allegedly made at the time of the signing of the License Agreement. In sum, we believe that the plaintiffs' fraud claims must fail for that reason.

▆ Plaintiffs' reliance upon *Hawthorn–Mellody, Inc.* and *Fisher* is misplaced. In both of these cases, the Kansas Supreme Court recognized the general rule that in order for fraudulent representations to constitute fraud, they must relate to some material past or existing fact. *Hawthorn–Mellody,* 518 P.2d at 451; *Fisher,* 527 P.2d at 1034. Each case, however, also recognized that a fraudulent representation as to future profits or income may be actionable when they are joined with statements as to past income or other present facts which are likely to affect future income. *Hawthorn–Mellody,* 518 P.2d at 452; *Fisher,* 527 P.2d at 1035. "An important factor supporting the decision in those cases was the existence of superior knowledge on the part of the promising party." *K–B Trucking Co. v. Riss International Corp.,* 763 F.2d 1148, 1157 (10th Cir.1985). The circumstances here are entirely different since there is no evidence to support a contention that Boeing made representations concerning past or present income. Moreover, the existence of superior knowledge of one party over another is lacking here since O'Quinn and Hill are extremely knowledgeable about the aircraft industry.

Boeing also contends, relying upon *Edwards v. Phillips Petroleum Co.,* 187 Kan. 656, 360 P.2d 23 (1961), that the plaintiffs' fraud claims are precluded by the terms of the integrated License Agreement. In *Edwards,* the Kansas Supreme Court pointed out that plaintiffs are presumed to know what they have signed, and to know when alleged oral promises contradict the written agreement. The court established the following rule:

> Where, however, the written contract, to the promisee's knowledge, reveals the falsity of the oral promise, the promisee cannot invoke the rule that fraud may be predicated on a promise made without the intention of performance.

360 P.2d at 27.

Plaintiffs assert that *Edwards* has no application here. They contend that it would apply only if the License Agreement revealed the falsity of the oral misrepresentations relied upon by plaintiffs. They assert that nothing in the License Agreement indicates that (1) Boeing would not spend $25 million to $60 million on the project; (2) Boeing's investment would be made after completion of the specified phases; and (3) Boeing would only begin production of the Skyfox upon receipt of a firm number of orders. Defendant counters that these arguments are without merit because the thrust of plaintiffs' complaint is that Boeing was obligated to produce and sell Skyfox aircraft, and not to ever terminate the Skyfox program. In effect, plaintiffs are arguing that they were induced to sign an agreement which contained provisions that were nullities. Defendant contends that plaintiffs cannot avoid the clear, unambiguous terms of an agreement.

Having examined the evidence in this case, including the License Agreement in some detail, we must conclude that the defendant is entitled to summary judgment on the plaintiffs' fraud claims. Plaintiffs' alleged reliance on defendant's alleged misrepresenta-

tions are unreasonable as a matter of law because the alleged representations were not contained in the License Agreement. The explicit integration and disclaimer clause contained in the License Agreement forecloses plaintiffs' fraud claims. In addition, the specific unambiguous clauses allowing Boeing the right to terminate at any time and not requiring it to produce the Skyfox also make clear that any reliance upon the alleged oral representations would be unreasonable. It makes no sense for plaintiffs to assert that they relied upon statements about the amount of money that Boeing intended to invest when they have signed an agreement giving Boeing the right to terminate the agreement at any time and eliminating any duty requiring Boeing to sell or produce the Skyfox airplane. The comments of the court in *Turner v. Johnson & Johnson,* 809 F.2d 90, 95–96 (1st Cir.1986) are equally applicable here:

> [A] contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable businesspeople—to pause. Moreover, if a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore. Even if a sales contract provided that the product for sale is old, the buyer could claim that she purchased it only because the seller said it was new. Contracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements. And the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements.

In sum, we find that the defendant is entitled to summary judgment on all of plaintiffs' claims of fraud.

## II.

Boeing next argues that it had no express or implied duty to exploit, sell, market, produce or promote Skyfox aircraft because such an obligation is expressly excluded by Article XIII of the License Agreement. Plaintiffs contend that Boeing is bound by an implied covenant to use its best efforts to exploit the licensed products. For support of its contention that the court must imply a covenant to exploit, plaintiffs rely primarily upon Kansas oil and gas cases. Plaintiffs argue that Article XIII does not defeat the implication of a covenant to exploit.

In arguing that a covenant to exploit must be implied in the License Agreement, plaintiffs have also suggested that a covenant of good faith and fair dealing must be implied as well. At oral argument, plaintiffs suggested that the implied covenant to use best efforts was a "species" of the implied covenant of good faith and fair dealing. Although plaintiffs fail to distinguish between these covenants, we must point out that they are indeed very different concepts. *See Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir.1992); *Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98, 100 n. 2 (6th Cir.1990). We shall approach the implication of each covenant from a different perspective.

### A.

Kansas courts have followed the trend of implying the covenant of good faith and fair dealing to almost every contract. *Bonanza, Inc. v. McLean,* 242 Kan. 209, 747 P.2d 792 (1987). *But see Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841 (1987) (implied covenant of good faith and fair dealing as applicable to all contracts is "overly broad and should not be applicable to employment-at-will contracts"). The purpose of the good faith doctrine in contract law is to protect the reasonable expectations of the parties by implying terms in the agreement. *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 (10th Cir.1988). The implied covenant is derivative in nature in that it does not create or supply new contract terms, but it grows out of existing ones. *Id.* The covenant guides the construction of explicit terms in an agreement. The concept of good faith becomes irrelevant

in the interpretation of a contractual provision which grants "uncontrolled discretion" to one of the parties. *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 729 (10th Cir.1991).

 The language contained in the License Agreement entered into between the parties provided that Boeing had no duty to promote and a right to terminate. This language precludes the plaintiffs from contending that they had a reasonable expectation of any implied protection. The concept of good faith became irrelevant on these matters.

The court's reasoning on the issue of the application of the covenant of good faith and fair dealing is similar to that which has been adopted by the Illinois courts in cases involving alleged breach of employment contracts. The Illinois courts have found that the covenant of good faith and fair dealing is implied in all contracts, including employment contracts. *See, e.g., Criscione v. Sears, Roebuck & Co.,* 66 Ill.App.3d 664, 23 Ill.Dec. 455, 458, 384 N.E.2d 91, 94 (1978). However, the Illinois courts have also followed the employment at-will doctrine. *Id.,* 23 Ill.Dec. at 459, 384 N.E.2d at 95. The Illinois courts have resolved this conflict by concluding that an employee at-will, who may be terminated for any reason, has no reasonable expectation that he will be terminated only for cause and, therefore, the implied covenant of good faith and fair dealing cannot require the parties to exceed that reasonable expectation. *See Zick v. Verson Allsteel Press Co.,* 623 F.Supp. 927, 931 (N.D.Ill.1985). As explained in *Beraha:*

> In short, the employment at-will cases do not reject the covenant of good faith and fair dealing. Rather, they hold that the covenant has not been breached where the employer's actions accord with the reasonable expectations of the parties.

956 F.2d at 1445.

In sum, we do not find that the plaintiffs had a reasonable expectation that the License Agreement would be terminated only for cause in light of the explicit language contained in the agreement. The termination of the License Agreement by Boeing does not conflict with the reasonable expectation of the parties and therefore does not breach the implied covenant of good faith and fair dealing.

**B.**

Plaintiffs' contentions concerning the implication of the covenant to use best efforts to the License Agreement are twofold. First, based on oil and gas cases, plaintiffs suggest that Kansas law requires that such a covenant be implied here. Second, plaintiffs argue that the covenant must be implied when an exclusive license agreement is present.

 In Kansas, there is a long history of implying covenants in oil and gas leases. *See Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 354 P.2d 326, 333 (1960) ("The doctrine of implied covenants of oil and gas leases has prevailed in this jurisdiction since the discovery of oil and gas . . . ."). The implied covenant to prudently develop has long been imposed in cases where the lease in question does not contain express provisions creating duties in the lessee. *Id.* This covenant requires a lessee to develop the leased land in the manner in which an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both. *Fischer v. Magnolia,* 156 Kan. 367, 133 P.2d 95, 99 (1943). The rationale for the implication of this covenant has been explained as follows:

> While the lessee desires to conduct the operation in accordance with the perceived best use of scarce economic resources, the lessor is interested in the maximum production of royalties. The lessor normally is without the special knowledge of oil and gas exploration which would allow him to protect his interests by express agreement. Therefore, covenants are implied to insure fair dealing between the parties.

Lungren, Deep Horizons—Legislative Shifting of the Burden of Proof in Implied Covenant Cases, 24 W.L.J. 30, 31 (1984) (footnote omitted).

In 1983, the Kansas legislature established by statute that the implied covenant to explore and develop would be included in all oil and gas leases when such covenants were not

contained in the leases. *See* K.S.A. 55–223. The legislature specifically determined that it was against public policy to waive the presumption of such an implied covenant. *See* K.S.A. 55–228.

Plaintiffs acknowledge that they have been unable to find any Kansas cases, other than oil and gas cases, that have implied the covenant to prudently develop or to use best efforts. The court agrees with the position of the defendant that the plaintiffs' reliance upon the oil and gas cases is misplaced. The rationale for the adoption of the implied covenant to prudently develop in oil and gas cases has very limited application to the circumstances of this case. We do not think the Kansas cases or the Kansas statutes on the implication of the covenant to prudently develop in oil and gas leases require the implication of the covenant here. The concerns of the Kansas courts and the Kansas legislature are very different on the implication of this covenant in oil and gas leases than they would be under the circumstances of this case.

The public policy of Kansas in this situation is probably better stated in K.S.A. 84–2–306(2) which provides as follows:

> A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

This aspect of the Uniform Commercial Code makes explicit that an implied covenant to use best efforts will be implied in an exclusive dealing contract *unless the parties otherwise agree.* Here, the parties agreed to a provision which specifically stated that Boeing had no duty to promote.

The cases cited by the parties from other jurisdictions concerning the implied covenant to use best efforts provide some additional guidance. The implied best efforts covenant arises from the landmark decision by Justice Cardozo in *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917). In *Lady Duff-Gordon,* the defendant, a fashion designer, gave the plaintiff the exclusive privilege of marketing defendant's designs.

The court implied an obligation to exploit the design, although there was not an express obligation to do so in the contract, because defendant's sole revenue from the grant of the exclusive agency was to be derived from plaintiff's sale of clothes designed by defendant, and defendant was thus at plaintiff's mercy. 118 N.E. at 215. Courts, in following *Lady Duff-Gordon,* have implied a covenant to employ best efforts in those cases where the only consideration for a grant of property lies in payment of royalties. *See Permanence Corp.,* 908 F.2d at 100. Without this implied covenant, the contract would lack mutuality of obligation and be inequitable. *Id.* "In making the determination of whether a covenant to use best efforts should be implied as a matter of law, this court must focus its attention on the terms of the written contract between the parties, and the circumstances surrounding the making of the agreement." *Id.* at 101 (citations omitted).

The aspect of this case which distinguishes it from the cases relied upon by the plaintiffs is the language contained in Article X(3). In Article X(3), the parties specifically agreed that Boeing did not have a duty to promote the Skyfox. In all of the cases in which the courts have implied a covenant to use best efforts, the contracts involved failed to contain any express language concerning performance of the contract. *See, e.g., Bailey v. Chattem, Inc.,* 684 F.2d 386 (6th Cir.1982); *Mechanical Ice Tray Corp. v. General Motors Corp.,* 144 F.2d 720 (2d Cir.1944), *cert. denied,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *Bellows v. E.R. Squibb & Sons, Inc.,* 359 F.Supp. 204 (N.D.Ill.1973); *Vacuum Concrete Corp. v. American Machine and Foundry Co.,* 321 F.Supp. 771 (S.D.N.Y. 1971). The implication of a covenant to use best efforts would be inconsistent with the agreement reached by the parties. We do not believe that the Kansas courts would impose such a covenant under these circumstances.

Several other factors also suggest that the covenant to use best efforts should not be implied here. In the early stages of negotiations between plaintiffs and defendant concerning the Skyfox, counsel for plaintiffs, Pe-

arcy, sought to include the following language in an MOU:

4. Performance Schedule: Notwithstanding anything to the contrary in any government document, Boeing shall have a duty to diligently prosecute the Skyfox proposal.

. . . . .

Boeing never agreed to the addition of this clause. The fact that Boeing refused to agree to an express "best efforts" clause is of some significance in determining whether an implied obligation should be imposed. *See Eastern Electric, Inc. v. Seeburg Corp.*, 427 F.2d 23, 26–27 (2d Cir.1970) ("It is surely of some significance in deciding whether an agreement contains an implied obligation that the party so arguing tried to make the obligation explicit and failed.").

In addition, the License Agreement contained the aforementioned merger clause. This fact also supports the conclusion that an implied covenant to use best efforts should not be applied here. Such a clause negates the implication of a duty to use best efforts. *See Beraha*, 956 F.2d at 1442; *Permanence Corp.*, 908 F.2d at 102.

In sum, the comments of the court in *Permanence* are applicable here:

It is not necessary for a court to interject a covenant to employ best efforts, a doctrine developed in the context of lack of mutuality of obligation, into every contract in which there is a grant of an exclusive agency. Especially, as is true in the present case, when an inventor grants a license to patented technology, the application of which is unknown, a commitment on the part of the licensee to devote best efforts to the development of the technology is a substantial commitment which should not be automatically inferred.

*Id.* at 103.

We turn next to the plaintiffs' contention that the covenant to use best efforts must be implied or the contract would fail for lack of mutuality of obligation. Plaintiffs contend that the license agreement is illusory if Article XIII is read as suggested by the defendant. Plaintiffs argue: "If Boeing does not have a duty to use best efforts to exploit,

market and develop licensed products, then Boeing has no duty at all and will not have given any legally enforceable promise in consideration for plaintiffs' grant of its exclusive worldwide license to patents and know-how."

The defendant contends that the obligation need not be implied because the License Agreement does not fail for lack of mutuality. The issue before this court is thus whether an implied covenant to use best efforts is necessary to establish mutuality of obligation, or adequate consideration, in the present case.

█ Courts have confused the concepts of mutuality of obligation and consideration. The concepts are distinct but do overlap. Consideration is essential to a valid contract while mutuality of obligation is not unless the want of mutuality would leave one party without a valid or available consideration for his promise. 17A *Am.Jur.2d* Contracts § 18 (1991). *See also Restatement (Second) of Contracts* § 79(c) (if the requirement of consideration is met, there is no additional requirement of mutuality of obligation).

█ Every contract requires consideration to be legally enforceable. *Dugan v. First National Bank of Wichita*, 227 Kan. 201, 606 P.2d 1009, 1017 (1980). Consideration is a benefit to the promisor or a loss or detriment to the promisee. *Coder v. Smith*, 156 Kan. 512, 134 P.2d 408, 409 (1943). Mutual promises and the acceptance of benefits, however small, constitute valid consideration. *In re Goff's Estate*, 191 Kan. 17, 379 P.2d 225, 236 (1963).

█ Defendant asserts that there was consideration for the License Agreement. First, Article IX, paragraph 5 of the License Agreement requires Boeing to pay fees, taxes and maintenance expenses on Skyfox related patents. Boeing notes that BMAC paid over $42,000 on the maintenance of Skyfox patents. Second, BMAC paid O'Quinn $6,000 a month or at hourly rates as a project pilot and prototype manager. The defendant acknowledges that these payments were not part of the original License Agreement, but that courts have held that other payments in connection with an exclusive license agreement are part of the equities in deciding whether to imply a duty of best efforts. *See, e.g., Kardios Systems Corp. v. Perkin–Elmer*

*Corp.,* 645 F.Supp. 506, 509 (D.Md.1986). The defendant contends that based upon the patent expenses and the fees paid to O'Quinn, the License Agreement does not fail for lack of consideration, and they provide incentive for BMAC to exploit the patent so that it is not necessary to imply a covenant of best efforts to protect the plaintiffs.

The undisputed facts disclose that the instant license agreement did not depend solely upon sales of the Skyfox for its consideration. The contract provided, *inter alia,* that Boeing would be required to perfect the patents of the plaintiffs' designs. This responsibility, which no one disputes, cost Boeing over $40,000 and provided sufficient incentive that Boeing would attempt to commercialize and market the Skyfox. Accordingly, we do not find that the implication of a best efforts obligation is necessary here to establish mutuality of obligation.

▮ Moreover, the fact that Boeing had an absolute right to terminate the contract does not necessarily indicate that the contract was illusory. Where, as here, the right to cancel is in some way restricted, as by the requirement of giving notice, the contract cannot fail for want of consideration. *See Sylvan Crest Sand & Gravel Co. v. United States,* 150 F.2d 642, 644–45 (2d Cir.1945); *Boccardo v. United States,* 341 F.Supp. 858, 862–63 (N.D.Cal.1972). *See also* Calamari & Perillo, *Contracts* § 4–12(c)(4) (3d ed. 1987); 1A Corbin, *Contracts* § 163 (1963). A promise is not rendered insufficient as consideration by reason of a power of termination reserved to the promisor. The parties to a contract are permitted to include a provision permitting the contract to be terminated upon the option of either party. Whether the contract is illusory depends upon the other aspects of the contract. The instant License Agreement was not illusory for the aforementioned reasons.

With the aforementioned rulings, the court finds that the defendant is entitled to summary judgment on plaintiffs' claims of breach of the License Agreement, breach of a fiduciary relationship and fraud.

### III.

▮ Finally, the defendant contends that plaintiffs' fourth claim must be dismissed.

Plaintiffs' position is that all data, spare parts and materials connected in any way with the Skyfox project should be returned to them. The basis for this claim is somewhat unclear. In their complaint, plaintiffs allege that "[b]y reason of the contractual and fiduciary relationship between the parties," the defendant should be required to deliver to plaintiffs "all valuable and useful data and property in its possession related to the Skyfox airplane and the Skyfox project."

The court has already ruled that a fiduciary relationship is not present here. Accordingly, this contention provides no basis for the return of any materials to the plaintiffs.

The contractual aspect of this claim is apparently based upon some language contained in the July 1 Agreement. However, this agreement was terminated on December 1, 1985. The other agreements before the court suggest that most of these items belong to Boeing. The License Agreement provides that the patents and know-how resulting from Boeing funded research and/or development work relating to Skyfox shall be the sole property of Boeing. The Proprietary Data Exchange Agreement provides that proprietary data belongs to the party who originates it, and the other party is not granted any license or ownership rights therein. Finally, many of the spare parts were purchased by Boeing and were paid for by Boeing. As to the items that belong to plaintiffs, the evidence before the court shows that they have been returned to plaintiffs. Plaintiffs have been unable to specifically identify any items that they contend should be returned to them by virtue of the agreements entered into by the parties. We find that defendant is also entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. # 84) be hereby granted. Judgment shall be entered for the defendant and against the plaintiffs on all claims.

**IT IS SO ORDERED.**