No. 47,315

CHARLES F. FISHER, *Appellee,* v. MR. HAROLD'S HAIR LAB, INC., a Kansas Corporation; HAROLD A. WILBORN, and CAROLYN WILBORN, *Appellants.*

(527 P. 2d 1026)

Opinion filed November 2, 1974.

*Daniel S. Garrity,* of Coombs, Lambdin, Kluge, Garrity and Moore, Chartered, of Wichita, argued the cause and was on the brief for the appellants.

*Otto J. Koerner,* of Koerner, Fleagle and Roach, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an action by a buyer against the sellers for damages for fraudulent representations allegedly occurring in connection with the sale of a retail business and certain franchise agree-

ments. The jury returned a verdict for the buyer of $60,000 actual and $7,500 punitive damages. Sellers appeal from the judgment rendered thereon.

At trial much of the evidence was sharply disputed. Our narrative necessarily will be in the aspect most favorable to the party prevailing in the trial court, the plaintiff. We relate the background first.

The business in question consisted of the retail sale of men's hair pieces, toupees, supplies and services. It operated under the name of "Mr. Harold's East—Your Toupee Establishment" on South Woodlawn street in Wichita. It was owned by Mr. Harold's Hair Lab, Inc., a Kansas corporation, and operated by Harold and Carolyn Wilborn, husband and wife, officers and sole stockholders of the corporation. The Wilborns had opened this store approximately in 1965 and operated it until the sale to plaintiff Charles F. Fisher in October, 1970. The Wilborns also operated a wholesale business in wigs and hair pieces from the same location.

Wilborn's work with hair pieces began as a boy when he helped his grandmother make wigs. Later after beauty school training and experience as an employee in beauty parlors in Indiana and Hollywood, he came to Wichita to work as a women's hair stylist. Eventually he opened his own salon and did business at various addresses. In 1958 he began to devote part of his time to men's hair pieces and in 1962 or 1963 opened his first men's hair store.

Initially Wilborn made a few men's hair pieces "from scratch". However, due to the expense, he soon began to contract their making with overseas manufacturers. After 1965 he made only an extremely small percentage of them. Wilborn decided to develop a franchising operation whereby others would use the name "Mr. Harold's" to sell hair pieces and supplies. In connection with this enterprise he prepared a franchise brochure and a store manual.

In 1970 plaintiff Fisher, a senior experiment test pilot with the Boeing Company at Wichita, began to search for a business investment to sustain him in the event the aerospace industry continued to decline. His only experience in business management had been some executive training furnished by Boeing. A chance meeting between the Fishers and the Wilborns led to social meetings and then discussions concerning sale of the business in question. In August, 1970, Wilborn began showing Fisher documents concerning a franchise in the hair piece business. Fisher insisted he was

only interested in purchasing a going concern, he did not want anything "blue sky" or speculative, his initial investment could not exceed $40,000 and would have to bring a return of $25,000 annually. Wilborn responded that would be no problem. In the course of the discussions Fisher received from Wilborn a franchise brochure, store manual, balance sheets and a comparative statement of income for the store in 1969 and 1970 as well as a document on the advantages of purchasing a Mr. Harold's Toupee Establishment.

Further discussions and negotiations finally resulted in a total price of $40,000 being established for sale of the retail establishment at Wichita known as Mr. Harold's East and certain franchise rights, the price to be broken down for the three items involved. The Wilborns' attorney, Jean Oliver Moore, was employed by Fisher to incorporate Cele, Inc., a corporation wholly owned by Fisher. Fisher made application for an SBA loan to finance the transaction. Mrs. Fisher began working in the store to learn how to operate the business. After the SBA loan had been cleared and received Fisher and Mr. Harold's Hair Lab, Inc., acting through the Wilborns, consummated the transaction by executing three agreements on October 26, 1970. The first was a contract of sale wherein Fisher agreed to purchase the stock, furniture and fixtures in the store on Woodlawn together with a lease on the premises and the right to continue the retail hair piece business. Consideration for this agreement was $25,527.00. The second was a franchise agreement where in for $5,000 Fisher was granted the exclusive right to operate a business retailing Mr. Harold's hair pieces within a certain area. The third consisted of a master licensing agreement whereby Fisher was given the exclusive right to sell Mr. Harold's franchises throughout the United States. Under this contract Fisher was to receive $1,500 as his commission for each franchise sold. For these rights Fisher paid $9,473.00, making a total of $40,000 for the entire transaction.

The Fishers then took over conduct of the retail business. The Wilborns continued to operate their wholesale business from the same store until December when they moved it to Denver. The retail business began to have a great many customer complaints regarding fit and quality of wigs. Hair pieces unfit for sale were received from Mr. Harold's. Fisher was experiencing problems selling franchises. He became concerned that Mr. Harold's was not

manufacturing the hair pieces because he received a thank you note from a manufacturer for an order he had not placed with the manufacturer.

On March 17 and 18, 1971, meetings between the parties were held to try to solve the problems. Wilborn explained he had purchased a few pieces due to production problems that was a temporary thing. An amended licensing agreement was entered into. The following day Fisher sold one franchise to a man in Colorado who had been contacted by Wilborn, for which Fisher received his commission. After these meetings Fisher continued to receive bad hair pieces. When he complained by telephone to Wilborn he was told he had to take what was furnished. By letter of March 29, 1971, Fisher requested permission to buy hair pieces from other sources. Wilborn replied through his attorney denying the request and stating the merchandise Fisher desired to purchase was substandard and that he had terminated business dealings with the firm handling it. However, in May Fisher received an invoice from this firm covering two toupees. Fisher subsequently learned Wilborn was buying ten or twelve wigs per month from this firm. In April or May, 1971, Fisher discontinued his efforts to sell franchises.

Fisher became increasingly concerned as to the representations which had been made to him by Wilborn. In May, 1971, a Texas manufacturer of hair pieces visited Fisher's store. He inspected hair pieces received from Mr. Harold's and concluded they were junk. Fisher also made an inventory of merchandise received from the Wilborns and compared the cost of it with the cost of comparable merchandise available from other sources. Upon this evaluation Fisher went to his attorney for guidance and in June, 1971, quit doing business with Mr. Harold's. His profit from the store's business from October 26, 1970, to May 31, 1971, was $3,000.

On June 28, 1971, this action was instituted. An order made as a result of pretrial conference listed eighteen specific fraudulent representations allegedly made by the Wilborns and relied on by Fisher in entering into the agreements. As indicated, jury trial resulted in a judgment for Fisher from which Mr. Harold's and the Wilborns have appealed.

Consideration should first be given to appellants' complaint the court erred in excluding certain testimony offered by them. Jean Oliver Moore was retained as corporate counsel for Mr. Harold's Hair Lab, Inc. in the spring of 1970. He was draftsman of the agree-

ments in question and consulted both Wilborn and appellee with regard to changes in their terms. Moore did not consider himself to be appellee's attorney during this period. In late September appellee asked him to serve as his attorney for the purpose of preparing incorporation papers for him. With the Wilborns' assent Moore performed this service for appellee. At trial appellants proffered the testimony of Moore concerning a conversation allegedly occurring sometime in September, 1970, between Moore and Fisher in the presence of the Wilborns wherein Moore talked about how hair pieces were constructed and that their manufacture was subcontracted out, to which appellee replied he knew that as Boeing was called a contractor but subcontracts most of its work out.

Appellee objected to this testimony on the ground it was privileged by reason of the attorney-client relation existing between him and the witness at the time. The trial court sustained the objection. Treating the matter solely as though Mr. Moore were counsel for appellee alone at the time of the conversation we believe the court erred in its ruling. The rule has always been that communications between attorney and client are privileged when made in professional confidence—this is the essence of our code governing the subject (K. S. A. 1973 Supp. 60-426 [a]). But communications not made in such confidence are not so privileged. In the case at bar either Mr. or Mrs. Wilborn, or both, were present during the communication. In *Hutton v. Hutton*, 184 Kan. 560, 337 P. 2d 635, the following was quoted approvingly:

". . . [I]f the client chooses to make or receive his communication in the presence and hearing of third persons it ceases to be confidential and is not entitled to the protection afforded by the rule, and that the very nature of the transaction and the circumstances surrounding it are inconsistent with the notion that the communication was ever intended to be confidential." (p. 565.)

In *Sparks v. Sparks*, 51 Kan. 195, 32 Pac. 892, this court stated with respect to the attorney-client privilege:

"Communications made to one who is acting for both parties, and in the presence of all the parties to the controversy, cannot be regarded as confidential or privileged." (p. 201.)

The question remains as to the prejudicial impact of the erroneous exclusion. Although one ground of misrepresentation relied upon was Wilborn's statement he was a manufacturer and had his own plant, and the evidence revealed he had quit making hair pieces after 1965 and was securing them from others, we think the exclu-

sion of the testimony was immaterial and nonprejudicial. The situation revealed by the proffered testimony respecting Boeing's use of subcontractors in their work was not at all comparable to the facts disclosed as to appellants' practice nor was it material to the representation made and relied upon. A manufacturer like Boeing does assemble and complete a finished product from component parts made by others under contract but the testimony here was that appellants were not furnishing custom manufactured pieces as represented but simply routine machine produced items ready-made by others. They were not manufacturers in any sense of the word, even through the means of subcontracts.

The remaining specifications of error depend primarily on insufficiency of evidence to support the verdict, an issue raised by appellants at trial level by motions for directed verdicts. The eighteen allegations of fraudulent representations relied on by appellee can be grouped in three areas—misrepresentations as to (1) number of franchises in operation (2) the hair pieces, i.e., origin, source, quality, where and how manufactured, and (3) value of the property transferred under the contract of sale and the rate of return on the investment. Much of the testimony on these items was highly controverted but our concern now is with that favorable to appellee and accepted by the jury. We further narrate evidence relating to the foregoing areas.

(1) Appellee testified that during the negotiations Wilborn represented to him the number of stores he had operating. Each of his hair pieces bore a label stating "Mr. Harold's Custom, Wichita, Oklahoma City, Tulsa, and Palm Springs". Appellants' letterheads bore the same indication. Wilborn also introduced to appellee persons who allegedly were buying six stores in Minneapolis and St. Paul, one license having been sold and five options taken for other stores. In fact, on October 26, 1970, when the agreements were made the Wilborns had only two stores—the one in question and another in Wichita known as Mr. Harold's West.

(2) With respect to representations concerning the hair pieces, the franchise brochure contained these statements:

"Mr. Harold has achieved fame as a manufacturer of top quality hair pieces for men during his thirty years of experience in this field.

.   .   .   .   .   .   .   .   .   .   .   .

"Mr. Harold manufactures hair pieces in his own plant, custom-made to conform to each individual.

.   .   .   .   .   .   .   .   .   .   .   .

"Mr. Harold's Will:

.   .   .   .   .   .   .   .   .   .   .   .   .

"11.   Manufacture custom items for your patrons to insure individuality and quality."

The store manual contained this:

"Our lab can make you a hairpiece of the highest quality. Comprised of 100% European hair. Custom-made to your exact specifications. Manufactured with the finest of American ingenuity and craftsmanship—right here in good'ole U. S. A.

.   .   .   .   .   .   .   .   .   .   .   .   .

"For this reason, MR. HAROLD's does not refine hair.  On the contrary—our hair is specially treated to give the appearance of living hair.

.   .   .   .   .   .   .   .   .   .   .   .   .

"ALL MR. HAROLD's pieces are hand ventilated according to the most severe standards.  All pieces ventilated in nylon netting are double knotted.

.   .   .   .   .   .   .   .   .   .   .   .   .

"Our production, based on the highest standards of quality, covers every need.  We use exclusively European human hair of the finest quality, scrupulously processed, and materials which have been tested carefully."

Appellee testified Wilborn gave him both the franchise brochure and store manual during negotiations and further told him he manufactured the hair pieces in the United States and they were available only through him; that they were hand ventilated on silk, and only European virgin hair (hair kept covered while growing and not exposed to sun, dyes, bleaches or other chemicals prior to cutting from the head) would be used; neither the inventory nor future purchases would contain animal hair.  It was later discovered many pieces were of animal hair, Oriental hair, excessively processed hair and hair of inferior quality.  Most were machine ventilated or wefted, poorly put together and they were not manufactured by appellants but were purchased ready-made from others, principally from a manufacturer in Spain.  They were not custom-made, so that the color matched the customer's hair.

(3)  As to the value of the property transferred under the agreements, the advantages, and hence the value, of a Mr. Harold's franchise were represented by appellants to lie in the fact the lowest prices possible would be available due to volume sales by Mr. Harold's, the manufacturer, without a middle man's profit and the fact access could be had to highest quality hair pieces available only through Mr. Harold's.  Actually the hair pieces supplied both in the inventory and later under the franchise came from various manufacturers, were priced higher than identical items available through other suppliers and were not of the quality represented.

The value of the master licensing agreement was in turn dependent on the value of a franchise, which turned out to be valueless and there was testimony by appellee and the Texas wig manufacturer to this effect. Appellee quit attempting to sell francises because his experience led him to believe he would be perpetrating a fraud in representing that Mr. Harold's produced quality hair pieces and the franchises would net $25,000 annually.

There was also testimony as to the value of the inventory and the business transferred under the contract of sale, priced therein at a figure of $25,527.00. Wilborn told appellee his accountant valued it at $54,000 or $55,000. Appellee's evidence showed it to be worth no more than $10,000 or $11,000. Appellants also represented there should be a return of $25,000 annually. Appellee made $3,000 in a little over seven months' operation. The franchise brochure indicated it was necessary to gross $147,000 in order to net $25,000 annually. Also that an investment of $27,150.00 should net a 93% return. The business documents submitted by appellants to appellee showed a gross of $105,000; however, Wilborn told appellee the records were "tax conservative" (meaning these records did not reflect the true profit of the business) and the business would make $25,000 or more annually. The records submitted actually included appellants' wholesale operations but appellee was not aware that anything beyond the retail business was included. There was evidence the business would have been worth as much as $125,000 had it been as represented and the master licensing agreement worth from $37,500 to $50,000.

Appellants contend the evidence did not establish fraudulent representations. In *McGuire v. Gunn*, 133 Kan. 422, 300 Pac. 654, this court stated:

"Actionable fraud includes any false representation on a material fact, knowingly or recklessly made, which is of such character that the party to whom it is made has a right to rely upon it, and does rely upon it to his injury. A representation is material where it relates to some matter which is so substantial and important as to influence the party to whom it is made." (p. 426.)

The person who asserts fraud must prove it by a preponderance of the evidence and such evidence should be clear, convincing and satisfactory (*Sipes v. Crum*, 204 Kan. 591, 464 P. 2d 1). Rules by which it is determined whether the evidence meets this test are stated in *Fox v. Wilson*, 211 Kan. 563, 507 P. 2d 252, thus:

"(1) The burden of proving fraud is by a preponderance of the evidence; this is a matter of quantum. (2) The character of the evidence required is

'clear and convincing;' this is a matter of quality. (3) By 'clear and convincing evidence' it is meant that the witnesses shall be found to be credible, and that the facts to which they testify are narrated exactly and in due order. (4) The trial court is presumed to have applied the correct standard in the absence of a showing to the contrary. (5) Such a 'showing to the contrary' is made if the record discloses no evidence which could be characterized as clear and convincing; if there is substantial competent evidence of the requisite quality to uphold the findings they will be sustained. (6) In making such a determination this court considers only the evidence of the successful party." (p. 579.)

Appellants' attack centers upon two of the elements necessary to establish fraud. They say most of the representations were either opinion or puffing and as such were not material statements of fact; secondly, the statements were not relied upon by appellee. In *Griffith v. Byers Construction Co.*, 212 Kan. 65, 510 P. 2d 198, this discussion appears:

". . . [T]he fraudulent concealment to be actionable has to be material to the transaction. A matter is material if it is one to which a reasonable man would attach importance in determining his choice of action in the transaction in question." (p. 73.)

In 12 Williston on Contracts, 3d ed., § 1490, it is stated:

"It is laid down in the cases that a misrepresentation must be material in order that the law may take notice of it as a fraud.

"If, however, a party to a bargain has made misrepresentations for the purpose of inducing action by the other, and the other party has acted, relying upon the misrepresentations, it seems that the former should not be allowed to deny that misrepresentations which have effectively served a fraudulent purpose were material." (pp. 342-343.)

The general rule on actionability of opinion or sales puffing is found in 37 CJS., Fraud, § 10, thus:

"To be actionable, a false representation must be one of fact as distinguished from an expression of opinion, which ordinarily is not presumed to deceive or mislead, or to influence the judgment of the hearer, and on which he has no right to rely, since he is assumed to be equally able to form his own opinion." (pp. 226-227.)

The rule is tempered by the fact all statements must be considered in the context of the circumstances under which they are made (37 CJS., Fraud, § 10, pp. 228-229) and where the terms of dealing are not equal, and the representor has superior knowledge of the subject, a statement which would otherwise be one of opinion will be regarded as one of fact (37 CJS., Fraud, § 10b., p. 230).

Returning to the specific allegations of fraud, appellee's evidence showed the hair pieces in several respects were not of the kind or quality represented. Although statements regarding Mr. Harold's

fame might properly be regarded as puffing appellants did not have thirty years' experience with men's hair pieces and did not manufacture their own hair pieces. The number of stores in operation was misrepresented and appellee's attempted investigation was met with explanations that ultimately proved false. The hair pieces were not available only through appellants; they were merely being resold by them. These were all statements of fact rather than mere opinion.

Appellants contend the statements concerning value of the inventory and the business were not actionable. Ordinarily, where goods are open to the inspection of the buyer, he is presumed to be as competent a judge of their value as the seller (*Elerick v. Reid,* 54 Kan. 579, 38 Pac. 814). But the rule depends on the factual situation. In 37 Am. Jur. 2d, Fraud and Deceit, § 115, it is stated:

"There are many exceptions to the general rule that statements of value are not a sufficient basis for a charge of fraud, such exceptions arising out of the special circumstances under which the representations are made. It cannot be laid down as a matter of law that value is never a material fact. For example, the general rule that such statements are not actionable applies only where the parties stand on an equal footing and have equal means of knowledge, with no relation of trust or confidence existing between them. Likewise, a statement of value may be of such a character, so made and intended, and so received, as to constitute fundamental misrepresentations; and if it is made as an assertion of fact, and with the purpose that it shall be so received, and it is so received, it may amount to a fraud. Moreover, a statement of value involving and coupled with a statement of a material fact is fraud." (pp. 159-160.)

In Ahrens, "Some Observations on the Law of Misrepresentation in Kansas", 9 Washburn L. J. 315, this appears:

". . . If one of the parties to a bargain represents himself as having special knowledge or his position is such that business expectations suggest that he is better informed than members of the general public or if one of the parties is obviously in a disadvantageous bargaining position, then the law frequently protects the weaker party and permits him to rely on statements of the other which would ordinarily not be actionable." (p. 326.)

Here the items of inventory and the value assigned to each were appended to the sale contract. Appellee was a test pilot and had no business background and no experience with hair pieces. Appellants were self-professed experts in the field. Appellee did purchase a hair piece from appellants during negotiations and he looked at some of the hair pieces in the inventory but he lacked the knowledge to assess the quality of the merchandise he saw. In *Wolf v. Brungardt,* 215 Kan. 272, 524 P. 2d 726, we held:

"The law does not deprive a defrauded party of relief because he had opportunity to investigate, when his lack of knowledge was such that the investigation would disclose nothing to him." (Syl. ¶ 3.)

Appellee not only lacked the knowledge to assess the value of the inventory, he did not see his own merchandise segregated until after appellants removed their own items and left for Denver. The only other establishment in the Wichita vicinity dealing with men's hair goods was Mr. Harold's other franchise. Appellants would have appellee's inspection preclude his reliance upon their representations. In Ahrens, *supra*, these observations are made:

"Reasonable care does not mean that a person must check out all statements made to induce the transaction. A buyer ought not to be required to investigate an apparently reliable statement made to him and should not treat another as if he is a thief and a robber. The *Restatement of Torts* has taken the position that a person to whom a statement is made may rely on it unless he knows or can see some obvious defect." (p. 333.)

In *Morrow v. Bonebrake*, 84 Kan. 724, 115 Pac. 585, it was said:

" 'Independent examination or investigation does not show conclusively that the party acted on his own knowledge or judgment, and not on a false representation made to him; and he is entitled to relief or redress if the circumstances and the nature of the subject matter were such that he could not learn the truth, or if it appears that without fault on his part he did not learn the truth, and that, notwithstanding his examination or investigation, he relied upon the representations as a material inducement.' " (pp. 727-728.)

Appellee testified his only knowledge respecting his bargain was that represented by appellants. He was unable even through inspection to discover what he had purchased until he became more familiar with the hair business and he placed reliance upon appellants' representations, particularly as to the value he was receiving, which the parties themselves made a principal element of their dealings.

Appellants contend the statements as to the income the business would generate were mere opinions or predictions relating to the future and therefore were not actionable. Ordinarily fraudulent representations to constitute fraud must relate to some material past or existing fact (*Dreiling v. Home State Life Ins. Co.*, 213 Kan. 137, 515 P. 2d 757). Predictions of future profits are not ordinarily fraudulent where the parties deal at arm's length; however, exceptions are stated in 37 Am. Jur. 2d, Fraud and Deceit, § 130, as follows:

"False representations of future profits of a business may be so gross as to constitute fraud, especially where the representor is experienced and has

superior knowledge of the business and the representee is inexperienced and ignorant of the facts and prospects respecting such business. Thus, in some cases wherein the defendant was held liable for false predictions concerning future profits or income, considerable emphasis was placed on the fact that the defendant had or professed to have superior knowledge, whereas the plaintiff did not have such knowledge and relied on the defendant's statements. In this connection it is held that a positive statement concerning future rents, profits, or income implies that the speaker has knowledge of facts which justify the prediction. . . .

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Moreover, it has been held that where the party making the prediction concerning rents, profits, or income intends it, and it is accepted as a statement of fact, the courts will ordinarily give it the legal effect of a statement of existing fact. Where false statements concerning future profits are joined with statements as to past income or other facts which are apt to affect future income, the court may hold that the statement as to future profits or income constitutes actionable fraud, or that the combination of statements constitutes fraud." (pp. 180-181.)

In *Hawthorn-Mellody, Inc. v. Driessen*, 213 Kan. 791, 518 P. 2d 446, we stated:

". . . The question whether fraud may be based on false statements as to future profits and income may be influenced to a considerable extent by the present degree of certainty or uncertainty as to what the future will bring. Where the subject of the sale is a new business, so that there are few existing facts concerning its profits or prospects, the future is unusually speculative and it may well be held that representations concerning future profits involve too much guesswork to constitute actionable fraud. Where a business is well established and where the false statements concerning future profits are joined with statements as to past income or other facts which are apt to affect future income, the courts have held that the statements as to future profits or income constitute actionable fraud or that the combination of statements constitutes fraud. See for example *Culp v. Bloss*, supra, where the seller represented to the purchasers that he was grossing $400 per month from vending machines and that they could do likewise. Another factor which the courts have emphasized is that a representation as to future profits or income may be held actionable where one party to a contract has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party, and which he could not discover by the exercise of reasonable diligence." (pp. 796-797.)

Appellants had started this business and had operated it for several years. During negotiations appellee repeatedly insisted he had to have an annual return of $25,000. He was assured by appellants the business would produce that. We need not repeat the other evidence on this aspect nor further labor the matter. We think there was clear and convincing evidence sufficient to support the jury's finding of fraudulent representations inducing the transaction.

Appellants further contend the proof of damages was insufficient to support the award rendered by the jury. The amount allowed was substantial but was within the range of competent evidence adduced by appellee. That of which appellants really complain is the "benefit of the bargain" rule upon which appellee based his lawsuit. This rule, that a purchaser who has been defrauded by false representations as to the quality, value or condition of the property he buys, may recover as damages the difference between the actual value of the property at the time of the sale and the value it would have had if the representations had been true, has always been followed in Kansas (*Walker v. Fleming Motor Co.,* 195 Kan. 328, 404 P. 2d 929). We adhere to the rule, the reason for which was expounded in *Fox v. Wilson,* supra, thus:

"In that situation, the 'benefit of the bargain' rule comes into its true role, which is to carry out the concept that 'A defrauded vendee is entitled to compensation for the contract he thought he was making and any advantage he would have obtained thereunder.' (*Walker v. Fleming Motor Co.,* supra, 195 Kan. at 333.) In *Epp v. Hinton,* supra, we noted that in this state the 'benefit of the bargain' rule obtains instead of the 'out-of-pocket' rule, saying (p. 516):

"'. . . The latter rule merely *protects the person deceived* from suffering actual loss; the former, which is the settled rule in this jurisdiction, gives him [the person deceived] the benefit of his bargain, and in effect forces the wrongdoer to make good his representations.' (Emphasis added.)" (p. 583.)

One further matter remains. We are confronted in this case by a record on appeal of 699 pages, three-fourths of which was designated by appellee. This counter designation contains much verbatim testimony of witnesses in question and answer form without any narration as could well have been done. Most of this testimony so designated was unnecessary. The trial court did require advancement by appellee of one-half the cost of printing this particular part of the record pursuant to Rule 6 (*h*) (211 Kan. xxviii). Also included in the counter designation are many pages of meaningless exhibits reproduced in full and with some sheer duplication. This is a substantial breach of our Rule 6 (*c*) and (*e*) (see *Johnston, Administratrix v. Ecord,* 196 Kan. 521, 533-534, 412 P. 2d 990). Accordingly, it is ordered that 60% of the total cost of the record on appeal be assessed against appellee and 40% against appellants, appellants to pay the remaining costs of appeal.

The judgment is affirmed.

APPROVED BY THE COURT.

FATZER, C. J., dissents.