**Robert J. ECKHOLT, Plaintiff,**

v.

**AMERICAN BUSINESS INFORMATION, INC., et al., Defendants.**

**Civ. A. No. 93–2440–KHV.**

United States District Court,
D. Kansas.

Dec. 2, 1994.

John M. Edgar, Steven E. Mauer, Matthew V. Bartle, Robert J. Hoffman, Bryan Cave, Kansas City, MO, for Robert J. Eckholt.

Heather Suzanne Woodson, Mark D. Hinderks, Roger D. Stanton, Stinson, Mag & Fizzell, Overland Park, KS, Elliot S. Kaplan, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for American Business Information, Inc., American Business Communications, Inc.

Robert J. Hoffman, Bryan Cave, Kansas City, MO, for Business Communications and Information Inc.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on *Plaintiff's and Counterclaim Defendants' Motion for Summary Judgment on Defendants' Amended Counterclaim and for Partial Summary Judgment on Plaintiff's Second Amended Complaint* (Doc. # 106). Plaintiff Robert J. Eckholt sued defendants American Business Information, Inc. ("ABI") and its subsidiary, American Business Communications, Inc. ("ABCI"), alleging various breaches of agreements, false promises and other claims arising out of an asset purchase agreement between Eckholt's company, Business Communications and Information, Inc. ("BCI") as seller and ABCI as buyer. Among other things, Eckholt claims that ABCI breached its obligations to him under an Employment Agreement that the parties entered into at the time of the sale. ABCI counterclaimed, alleging that Eckholt and BCI made fraudulent and negligent misrepresentations and also committed fraud

through silence in connection with ABCI's acquisition of BCI's assets.

In this motion, Eckholt and BCI[1] claim they are entitled to summary judgment on ABCI's counterclaims for fraudulent and negligent misrepresentation because ABCI cannot show (1) that it reasonably and justifiably relied on Eckholt's and BCI's representations and (2) that Eckholt and BCI had superior knowledge regarding future events which was outside the reasonable reach of ABCI. Eckholt and BCI also claim they are entitled to summary judgment on ABCI's counterclaim for fraud through silence because they had no obligation to communicate material facts to ABCI. Finally, Eckholt claims he is entitled to summary judgment on his claim against ABCI for breach of the Employment Agreement.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court considers all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The nonmoving party, however, "may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Thus, summary judgment may be entered "against any party who fails to make a sufficient showing to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

---

1. ABCI's counterclaim names Bill J. Reed, Klaus A. Dueck, Dennis L. Boesiger, Paul D. Garnett, Richard B. Lantefield, and M.L. Steinmetz (the "Other Shareholders" of BCI) as counterclaim defendants in addition to Eckholt and BCI. Although they have since withdrawn their own counterclaims from the case, the Other Shareholders join Eckholt and BCI in moving for summary judgment on ABCI's counterclaims against them for fraudulent and negligent misrepresentation and for fraud through silence.

Having examined the record in light of the relevant law, the Court finds that the motion should be overruled for the reasons stated below.

## I. *Background* [2]

BCI, which conducted business as Seminars International, was in the business of providing seminars to the public and to corporate clients. Eckholt was the President, Chief Executive Officer and largest shareholder of BCI. ABI is a publicly traded company based in Omaha, Nebraska, that markets business lists to businesses that provide products and services to other businesses. Jon Hoffmaster, during the relevant time period, was the President and Chief Operating Officer of ABI.

### A. Preliminary Negotiations

In mid–1992 Hoffmaster began discussions with Eckholt regarding ABI's acquisition of BCI's assets. The discussions between ABI and BCI continued for nearly a year, until the deal closed in June 1993. At one point in late 1992, Hoffmaster visited BCI's offices in Johnson County, Kansas, where he met with Eckholt for about two hours and with Eckholt and two other key BCI employees, Kathy Eshnaur and Steve Marshall, for another hour. He also received from BCI executive summaries prepared by Eckholt which included information on how the seminar business worked, new programs of BCI's and response rates and projections for the seminars business. As the discussions progressed in 1993, Hoffmaster made two or three trips to Kansas to meet with Eckholt to discuss the acquisition. He took ABI's in-house accountants with him on one or two of the trips. Eckholt also arranged for Steve Marshall to go to Omaha to see ABI's operation and talk with Hoffmaster.

In May 1993 ABI and BCI executed a letter of intent for the sale. Under the terms of the letter, ABI would form a new company called ABCI. The new company would then purchase the assets of BCI from Eckholt and the other shareholders for $2,925,000 in cash, 30,000 shares of ABI and 20% of the common stock of the new company. The total purchase price was worth about $4,000,000.

### B. Due Diligence

Around the time the letter of intent was signed, ABI assembled a team to do due diligence on BCI under Hoffmaster's supervision. The team consisted of Daniel Nealon from Coopers & Lybrand, James Pflug, Corporate Controller for ABI and its subsidiaries, Edward Fuxa, Controller for ABI, and Steven Isenberg, Controller for ABI's subsidiaries. The due diligence team was asked to take a hard look at the revenue stream, the underlying information, what was driving the revenues, the types and number of seminars that were being held, and statistical information underlying these analyses. They were provided access to all the BCI books and records they knew about. However, ABCI contends it was not given access to certain records or documents that the due diligence team would have considered material if it had known of them, including memoranda by Eshnaur regarding an absence of new programming, a Standstill Agreement preventing certain disclosure of information that BCI and Eckholt had entered into with Eshnaur and Marshall, and Eckholt's notes concerning a presentation to BCI shareholders, in which he discussed BCI's need for a cash infusion.

The due diligence team spent approximately three days at BCI's offices in Kansas City in May 1993. During this time, Mr. Fuxa of the due diligence team mainly reviewed BCI's seminar detail reports for all of 1992 and January through April of 1993. The reports provided information on how many types of programs were being held, specific program titles, how many times each program was conducted, the number of attendees, the number of mailings and the response rates. From the seminar detail reports, Fuxa prepared a summary of response rates and margins on all seminars held from December 1991 to April 1993. The team also reviewed a summary of the number of semi-

---

**2.** The following facts are either uncontroverted or, where controverted, construed in the light most favorable to the nonmoving party. Imma-  terial facts and factual averments not properly supported by the record are omitted.

nar titles that were given by month for 1991, 1992 and 1993, with projected seminars that were to be given each month for the rest of 1993.

Fuxa discussed each of the seminar detail reports with Rick Lantefield, BCI's Chief Financial Officer. Lantefield also told Fuxa that BCI had developed new programs that were being tested in certain markets and that BCI was reviewing the reports to see if it wanted to "roll forward" with those new programs.

There were about 10 or 15 new programs that BCI had tested in some way. Some of the response rates for these programs were positive, while others were not. BCI maintains that Lantefield discussed the numbers with Fuxa and that all the factors on whether the new programs had been properly tested were available for the due diligence team in the seminar detail reports. ABCI contends, however, that to understand the effect of planned new programs, it is necessary to do more than just review the numbers; ABCI argues that the due diligence team could not conduct the necessary subjective evaluation of the new programs because it did not have knowledge of how the industry worked or even what the programs were about.

The ABI due diligence team reviewed BCI's projected income for 1993, including the assumptions on which those projections were based. They compared the assumed response rate of .37% in the projections to actual response rates for BCI, which were .405% for 1991, .366% for 1992 and .356% for the first four months of 1993. The due diligence team noted the declining trend for response rates and was concerned that the assumed rate of .37% for 1993 and 1994 was too high.

### C. Eckholt's Assurances

The team asked Eckholt about the reasonableness of using a .37% response rate. Eckholt assured them that the projections were reasonable in light of the 10–12 new programs that BCI had "in the can" and ready to go; Eckholt felt that these new programs were "no brainers" and would bolster the response rate. He also told the due diligence team that he felt comfortable with the .37%

projection because the existing rate was relatively close to that. He did not guarantee that the response rate would remain at .37% for 1993 and 1994, but he said that he felt it was a reasonable assumption. He asserted that, while response rates may vary, they do not vary significantly.

The due diligence team relayed their concern about the declining response rates to Hoffmaster and told him of their conversation with Eckholt. Hoffmaster then met with Eckholt himself, and Eckholt explained that the decline was a normal occurrence. He told Hoffmaster that certain seminar programs have a life expectancy of two or three years, after which the response rates may go down. He explained that this natural decline gave rise to the need for new programs, such as the 10–12 new ones that BCI was developing. Eckholt expected that the new programs would have a response rate of .4%, and that, averaged with the older programs, the total response rate would be around .37%. Hoffmaster asked for a list of the new programs in development, and Eckholt showed him from the records on his desk what programs BCI was working on developing.

Hoffmaster believed from the beginnings of his negotiations with Eckholt that Eckholt was a somewhat overly optimistic person, and he believed this at the time he was discussing the anticipated future success of the new programs in development with him. In late 1992, prior to the due diligence team's work, Hoffmaster had discussed the development of new programs with Kathy Eshnaur of BCI. She told Hoffmaster that the programs were being tested and that "some of them were okay and some were not." From this discussion, Hoffmaster knew that some of the new programs Eckholt listed in his office were not good ones in Eshnaur's view. At the time Eckholt assured him .37% was a reasonable projection, Hoffmaster also knew, from the due diligence team's work, that the response rates for three of the first four months of 1993 were below .37% and that the average was below .37% for the first four months of the year.

### D. Hoffmaster's Experience

Hoffmaster had been in the direct mail business since he joined ABI and had had experience with response rates. He knew that response rates fluctuate and that they are affected by external factors such as the economy and the marketing and pricing strategies that the competition employs. Hoffmaster also testified that he knew that it was difficult to predict response rates with certainty, but that ABI was able to "come close" in its predictions.

### E. Conclusion of Due Diligence

At the conclusion of due diligence, Mr. Nealon of the team had formed the impression that ABI ought to look at the BCI acquisition carefully since BCI was heavily dependent on only about four major seminars, which BCI had been holding frequently. He did not see any of the new programs that Eckholt had discussed with the due diligence team. Although Lantefield and Eckholt had assured Nealon that new seminars took some time to gain acceptance and they felt BCI's projections were achievable, Nealon was not certain BCI would be able to meet those projections. He expressed this concern to the other members of the due diligence team, and he sensed that they shared his concern. Nealon and the other members of the team were, however, comforted by the representations Eckholt and Lantefield made regarding the reasonableness of the projections.

According to BCI, at the close of due diligence, Mr. Fuxa of the due diligence team had concluded that BCI had only a limited number of programs, that those had been around for years, that BCI had not identified any new programs that had been truly tested and that would change BCI's situation, and that BCI was a fairly stagnant company in terms of prospective growth or decline. According to ABCI, however, Eckholt represented at the close of due diligence that 10–15 programs which Fuxa had discussed with Lantefield were ready to use and that Eckholt was positive the company would grow because of them.

After the due diligence team returned to Omaha, Pflug and Fuxa met with Hoffmaster in his office and provided him with a copy of the team's report. During the meeting, Pflug and Fuxa expressed their concerns about the declining response rate, the fact that BCI's revenue was dependent on a few seminar titles whose response rates were dropping, and the projected .37% response rate for programs in the future.

### F. ABI's Reliance

ABCI maintains that Eckholt and BCI made repeated assurances during due diligence that their projections for growth, revenues, net operating income and response rates were reasonable, reliable and "damn conservative." ABCI claims that ABI relied upon these assurances. ABCI further claims that the due diligence team did not have sufficient information available to it to discern that Eckholt's representations were unreliable. ABCI argues that BCI and Eckholt had superior knowledge of the seminars business, which should have allowed them to realize, where ABI's due diligence team could not, that the projections were unattainable in view of BCI's condition and the condition of its new programs.

### G. Transaction Closing

ABI elected to go forward with the acquisition of BCI's assets. Both parties were represented by counsel, and the closing was held on June 11, 1993. ABCI, as the acquiring company, had been incorporated as a wholly owned subsidiary of ABI ten days prior to the closing, and the asset purchase agreement was executed between BCI as seller and ABCI as buyer.

### H. Employment Agreement and Modification Letter

As part of the transaction, Eckholt and ABCI entered into an Employment Agreement (the "Agreement"), and on June 11, 1993, they also executed a Modification Letter to the Agreement (the "Letter"). The Agreement provided that ABCI would employ Eckholt as President for three years; he was to receive a salary of $150,000 per year plus bonuses and stock options based on performance and determined by the board of

directors. By its terms, the Agreement provided for early termination upon (1) the mutual agreement of the parties; (2) Eckholt's death; or (3) the company's option "for cause." Cause was deemed to exist in a limited number of circumstances, including Eckholt's commission of an act of fraud, malfeasance or gross negligence.

The Letter also provided for Eckholt's early termination if he failed to meet certain performance criteria:

> We will not consider your performance satisfactory as President of ABCI and your contract will be in default unless ABCI shall attain each year pretax, preamortization profits equal to 12% of the current year's gross revenues with 10% gross revenue growth over the previous year. If you have not met these standards, we will have the option to terminate you on 30 days notice. If we exercise this option, you will receive three months severance pay and we will purchase your stock in ABCI as set forth below....

Almost immediately after the sale and the execution of the Agreement and Letter, ABCI's performance began to deteriorate. The company remained marginally profitable in July 1993, but the response rate had dropped by then to .282%. The situation worsened in August and September, when the response rates were .268% and .228%, respectively. By September, the company was operating at a loss.

### I. Eckholt's Termination

On October 1, 1993, Hoffmaster sent Eckholt a letter informing him that he was being terminated "pursuant to your Employment Agreement dated June 1, 1993 and the supplementary letter of June 11, 1993 which amends and modifies said Employment Agreement." Hoffmaster's letter specified that Eckholt had failed to meet the performance standards set forth in the Letter in that ABCI had failed to achieve the required profit or gross revenue growth. He stated that ABCI was therefore exercising its option to terminate Eckholt's employment. Eckholt did not receive three months' severance pay, and ABCI did not buy back his stock.

### J. Lawsuit and Claims

Eckholt sued, alleging among other things that ABCI breached the Agreement and Letter that together formed the employment contract between the parties. ABCI counterclaimed against Eckholt and BCI, claiming that they fraudulently induced it to enter into the whole purchase and sale arrangement, which encompasses the Agreement and Letter.

In the motion before the Court, Eckholt moves for summary judgment on his claim that ABCI breached the Agreement, and BCI and Eckholt move for summary judgment on ABCI's counterclaims for fraudulent misrepresentation, fraudulent omission and negligent misrepresentation. They argue that ABCI's claims of fraudulent and negligent misrepresentation fail as a matter of law because ABCI cannot show justifiable reliance on their representations in light of the information that ABI had reasonably available to it and because Eckholt and BCI did not have superior knowledge to ABI's about future events. They also argue that ABCI cannot prove fraudulent omission because they had no duty to communicate the material facts to ABI that ABCI now alleges they omitted.

### II. *Fraudulent and Negligent Misrepresentation*

ABCI alleges that BCI and Eckholt made fraudulent and negligent misrepresentations during the course of the negotiation of ABCI's purchase of BCI's assets. The false representations alleged are basically that the response rate for 1993 would be near .37%, that BCI had 10–12 new programs ready to use that had been properly tested and found to be profitable, and that BCI's projected revenues for 1993 would be $9.412 million. BCI and Eckholt move for summary judgment on the grounds that ABCI cannot prove that it justifiably relied on BCI's and Eckholt's representations or that BCI and Eckholt had superior knowledge to that which was available to the ABI due diligence team.

### A. Justifiable Reliance

In order to prove a claim for fraudulent misrepresentation of existing facts un-

der Kansas law, the claimant must show (1) an untrue statement of material fact; (2) known to be untrue by the person making it; (3) made with an intent to deceive or with reckless disregard for its truth or falsity; (4) the justifiable reliance by another party on the statement's truthfulness; and (5) injury as a result of the reliance. *Bank IV Salina, N.A. v. Aetna Casualty & Surety Co.*, 810 F.Supp. 1196, 1207 (D.Kan.1992). Negligent misrepresentation is a "lesser included" claim; it differs from fraudulent misrepresentation only in that, while the latter requires knowledge that the statement was false, the former merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information. *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609, 616 (1994); *Raymark Indus., Inc. v. Stemple*, 714 F.Supp. 460, 468 (D.Kan.1988).

■ To prove its claims of fraudulent and negligent misrepresentation, ABCI must demonstrate that its reliance was "reasonable, justifiable and detrimental." *Comeau v. Rupp*, 810 F.Supp. 1127, 1161 (D.Kan. 1992). The test for reasonableness is "whether the recipient has 'information which would serve as a danger signal and a red light to any normal person of [equal] intelligence and experience.'" *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1158 (10th Cir.1985) (citations omitted). Put another way, the test is "whether the recipient of the information has knowledge that would alert a reasonable person to the potential falsity of the information." *Metal Trading Services v. Trans–World Services*, 781 F.Supp. 1539, 1545 (D.Kan.1991).

■ BCI and Eckholt argue that the due diligence team turned up information regarding the inadequacy of the new programming during the course of its inquiry that should have served as a danger signal to ABI and should have given the red light to the transaction. Therefore, BCI and Eckholt argue,

the reasonable reliance element of ABCI's claims fails. ABCI points out that, although red flags came up during due diligence, Eckholt was questioned specifically about them and provided assurances upon which ABI reasonably thought it could rely.

Eckholt and BCI essentially argue that because ABI did due diligence in preparation for the transaction and discovered certain "red flags" in the process, ABI could not reasonably rely on the assurances it allegedly received from Eckholt and BCI outside of that due diligence process. However, that is not necessarily the case in Kansas under all factual circumstances. In *Sippy v. Cristich*, 4 Kan.App.2d 511, 609 P.2d 204 (1980), the prospective purchasers of a house noticed water stains on the carpet and ceilings, and they personally inspected the roof for leaks. They were assured, however, that the roof had been repaired. After they purchased the house and the roof leaked, they brought suit and successfully overcame sellers' argument that their reliance on the statement that the roof had been repaired was not justifiable. In that case, the court noted

... the fraud did not consist in the [sellers] advising the [buyers] that the roof had never leaked; the fraud occurred when they claimed the roof had been repaired and was in good condition. Because of this, it is of no material significance that there were water stains upon the carpet or rug. The [buyers] did, in fact, follow up on the danger signals they observed and made repeated inquiries concerning the roof and whether the leaks had been repaired.

*Id.* 609 P.2d at 208. Here, ABCI alleges not that the fraudulent and negligent misrepresentations occurred during the due diligence, but afterwards, when it, as the prospective buyer, followed up on the danger signals by making repeated inquiries of Eckholt as to the status of the new programs. Whether Eckholt gave ABI assurances [3] regarding the

---

**3.** Eckholt and BCI contend that Eckholt's alleged assurances cannot form the basis for a false representation claim because "a false representation must be one of fact as distinguished from an expression of opinion, which ordinarily is not presumed to deceive or mislead, or to influence

the judgment of the hearer, and on which he has no right to rely, since he is assumed to be equally able to form his own opinion." *Fisher v. Mr. Harold's Hair Lab, Inc.*, 215 Kan. 515, 523, 527 P.2d 1026, 1033 (1974). However, whether Eckholt's assurances assumed the form of opinions

then-existing condition of BCI and its new programs and whether ABI justifiably relied on those assurances are questions of fact, and summary judgment may not properly be entered against ABCI on its claims for fraudulent and negligent misrepresentation of existing facts.

### B. Superior Knowledge

■ In addition to the false representations about the status of BCI's new programs, ABCI also alleges that Eckholt and BCI made false representations about future response rates and revenues of the business. Ordinarily, false representations, to constitute fraud, must relate to some material past or existing fact as opposed to actions in the future which might or might not occur. *Whitten v. Farmland Industries, Inc.*, 759 F.Supp. 1522, 1542 (D.Kan.1991). Predictions of future profits ordinarily may not be considered fraudulent where the parties deal at arm's length. *Fisher v. Mr. Harold's Hair Lab, Inc.*, 215 Kan. 515, 525, 527 P.2d 1026, 1034 (1974). However, false representations of future profits of a business "may be so gross as to constitute fraud, especially where the representor is experienced and has superior knowledge of the business and the representee is inexperienced and ignorant of the facts and prospects respecting such business." *Id.* 527 P.2d at 1035. Put another way, a representation as to future profits or income may be actionable "where one party to a contract has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party, and which [the other party] could not discover by the exercise of reasonable diligence." *Hawthorn–Mellody, Inc. v. Driessen*, 213 Kan. 791, 797, 518 P.2d 446, 452 (1974). Whether Eckholt and BCI had such superior knowledge is a question of fact about which ABCI has identified sufficient evidence to withstand this motion for summary judgment.

■ ABCI has introduced evidence that Eckholt had been in the seminar business since 1991, operating Seminars International,

while ABI and its employees and officers had never been in the seminar industry prior to ABCI's acquisition of BCI. Although Hoffmaster had worked with response rates before in ABI's business, ABCI maintains that ABI's personnel and due diligence team did not know enough about the seminars industry to conclude prior to closing that Eckholt's representations about the future profitability of BCI were unreasonable or false.

Furthermore, ABCI alleges that Eckholt and BCI had superior knowledge about specific facts that were material to the transaction and that were not disclosed to ABI prior to closing. For example, ABCI alleges among other things (1) that BCI entered into a "Standstill Agreement" with certain of its critical employees that limited their disclosure of information to the due diligence team; (2) that one of the founders of BCI had told Eckholt that the lack of available new programming would have an adverse impact on the company in the summer or fall of 1993; (3) that Eckholt had told BCI board members in April 1993 that BCI needed a $1 million cash infusion to survive; and (4) that Eckholt had discussed a serious downturn in business coming in the spring of 1993.

ABCI has presented sufficient evidence of these facts to overcome BCI and Eckholt's motion for summary judgment on its fraudulent and negligent misrepresentation claims, and the evidence may be sufficient to convince a jury that Eckholt and BCI are liable for false statements about BCI's expected performance because they had superior knowledge of the seminars industry and of certain specific facts concerning BCI's business. Therefore, summary judgment on ABCI's claims for false statements regarding future events is inappropriate.

### III. *Fraudulent Omissions*

■ Eckholt and BCI argue that they are entitled to summary judgment on ABCI's claims against them for fraudulent omissions, or fraud through silence. In order to establish a claim for fraud through silence under

or of factual statements and whether they were intended to deceive, mislead or influence the judgment of Hoffmaster and the due diligence team are questions of fact, which must be decid-

ed by the jury and which, in this case, help preclude summary judgment on ABCI's false representation claims.

Kansas law, the claimant must prove the following elements:

> (1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could [not] have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff.

*Flight Concepts Ltd. Partnership v. Boeing Co.*, 819 F.Supp. 1535, 1545 (D.Kan.1993), *aff'd*, 38 F.3d 1152 (10th Cir.1994). BCI and Eckholt argue that they cannot be held liable for any omissions in the information they communicated to ABCI because they had no duty to disclose material facts to ABCI in this arm's length transaction.

▄▄▄ Fraud through silence is actionable where a party is under a legal or equitable obligation to communicate and thus cannot remain "innocently silent." *Monarch Normandy Square Partners v. Normandy Square Assoc. Ltd. Partnership*, 817 F.Supp. 899, 906 (D.Kan.1993). The obligation arises from the relationship between the parties, and where the parties are contracting, the duty arises "when there is a disparity of bargaining powers or expertise." *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 760, 576 P.2d 674, 679 (1978). That situation can arise where one party to the contract "has knowledge of a fact material to the transaction and not within the fair and reasonable reach of the other party and which the other party could not discover by the exercise of reasonable diligence...." *Horsch v. Terminix Int'l Co.*, 19 Kan.App.2d 134, 138, 865 P.2d 1044, 1048 (1993). A fact is material if a reasonable person would attach importance to it in determining his or her choice of action in the transaction in question. *Id.*

▄▄▄ A seller can also incur a responsibility to disclose material facts when the seller has knowledge of a defect in the property which is not within the fair and reason-

able reach of the buyer and which the buyer could not discover through the exercise of reasonable diligence. *Green v. Geer*, 239 Kan. 305, 308, 720 P.2d 656, 658 (1986). Finally, a duty to disclose may also be found where one party to a transaction " 'knows that the other is about to enter into the transaction under a mistake as to [the material] facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts.' " *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan.App.2d 546, 550, 857 P.2d 1362, 1365 (1993), *quoting Griffith v. Byers Constr. Co. of Kansas, Inc.*, 212 Kan. 65, 71, 510 P.2d 198, 203 (1973).

▄▄▄ In this case, ABCI argues that the objective circumstances placed the parties in a relationship where Eckholt and BCI had a duty to disclose material facts which they did not. ABCI asserts that BCI and Eckholt had greater expertise in the seminars business, that they had knowledge of defects in the company that was being sold which ABCI's due diligence team could not have discovered through the exercise of reasonable diligence, and that the close relationship of the parties, both before and after the sale, made it reasonable for ABCI to expect Eckholt and BCI to disclose additional information about the financial outlook of the company and the status of the new programs. All of these issues are questions of fact; accordingly, BCI and Eckholt's motion for summary judgment on ABCI's claims for fraudulent omission must be overruled.

### IV. *Employment Agreement*

▄▄▄ Eckholt argues that, by terminating him four months into his three-year employment contract on the grounds that he did not meet the required yearly performance standards, ABCI breached its employment contract with him as it is defined by the Agreement and Letter that the parties entered into at the time of the asset purchase agreement. ABCI counters that it did not breach the terms of the parties' agreement; that by October 1 when Eckholt was terminated, the impossibility of Eckholt's meeting the yearly performance standards had be-

come clear; and that, even more importantly, ABCI was fraudulently induced to enter into the agreement in the first place. Therefore, ABCI argues, the employment agreement should be rescinded.

In order to obtain rescission of the employment agreement, ABCI must prove each of the elements of fraud. As discussed above, whether BCI and Eckholt fraudulently induced ABCI to enter into the Agreement and Letter with Eckholt is a question of fact which must be decided at trial. If the jury finds that ABCI was fraudulently induced to enter into the agreement and the agreements are therefore set aside, no action for breach of contract will lie. If ABCI fails to prove fraud and rescission is therefore not available to ABCI, the Agreement and Letter will remain intact. Even in that instance, however, Eckholt's motion for summary judgment on his claim against ABCI for breach of their employment agreement must be overruled. Whether ABCI breached its obligations under the employment agreements or was entitled to repudiate them because of the impossibility of Eckholt's satisfactory performance remains a question of fact for the jury to determine at trial.

**IT IS THEREFORE ORDERED** that *Plaintiff's and Counterclaim Defendants' Motion for Summary Judgment on Defendants' Amended Counterclaim and for Partial Summary Judgment on Plaintiff's Second Amended Complaint* (Doc. # 106) be and hereby is **OVERRULED** in its entirety.